| 4/13/2017 | STEPHEN R. KREBS, M.D. | 1 (1 - 4) |

### Page 1

```
 1  
 2       IN THE UNITED STATES DISTRICT COURT
 3         FOR THE DISTRICT OF COLORADO
 4  
 5  
 6  JOHN MICHAEL BROADUS,
 7       Plaintiff,
 8  vs.      Case No. 1:15-cv-00182-WJM-KLM
 9  CHAPDELAINE,
10  ASSOCIATE WARDEN,
11  et al.,
12       Defendants.
13  
14  
15        VIDEOTAPED DEPOSITION OF
16        STEPHEN R. KREBS, M.D.,
17  taken on behalf of the Plaintiff, pursuant to
18  Notice to Take Deposition, beginning at 2:58 p.m.
19  on the 13th day of April, 2017, at the offices of
20  Appino & Biggs Reporting Service, 5111 S.W. 21st
21  Street, in the City of Topeka, County of Shawnee,
22  and State of Kansas, before Barbara J. Hoskinson,
23  Certified Court Reporter, Kansas License No. 0434.
24  
25  
```

### Page 2

```
 1            APPEARANCES
 2  
 3  
 4  ON BEHALF OF THE PLAINTIFF:
 5  
 6    Ms. Nora Q. E. Passamaneck
 7    Wilmer Hale, LLP
 8    1225 17th Street, Suite 2600
 9    Denver, Colorado  80202
10    720-274-3135
11    nora.passamaneck@wilmerhale.com
12  
13  
14  ON BEHALF OF THE DEFENDANT CHP:
15  
16    Mr. Andrew David Ringel
17    Hall & Evans, LLC-Denver
18    1001 17th Street, Suite 300
19    Denver, Colorado  80202
20    303-628-3300
21    ringela@hallevans.com
22  
23  
24  ALSO PRESENT:
25    Mr. Tim Faulhaber, Videographer
```

### Page 3

```
 1              INDEX
 2  
 3  
 4  Certificate --------------------------- 76
 5  
 6  
 7              WITNESS
 8  ON BEHALF OF PLAINTIFF:           PAGE
 9  STEPHEN R. KREBS, M.D.
10  Direct-Examination by Ms. Passamaneck    4
11  
12  
13             EXHIBITS
14  DEPO EXHIBIT NO.:              MARKED
15  No 23  Deposition Notice         9
16  No 24  Defendant CHP Expert Disclosures   16
17  PREVIOUSLY MARKED EXHIBITS
18  Wunder No 5  Utilization Review forms
```

### Page 4

```
 1       THE VIDEOGRAPHER:  Good afternoon.  My
 2  name is Tim Faulhaber, the videographer.  The
 3  court reporter is Barb Hoskinson.  We're
 4  representing Appino & Biggs Reporting Service.
 5  Today is the 13th day of April 2017 and the time
 6  is approximately 2:58 p.m.  We are at the offices
 7  of Appino & Biggs Reporting Service to take the
 8  deposition of Stephen R. Krebs, MD, in the matter
 9  of John Michael Broadus vs. Chapdelaine, Associate
10  Warden, et al., Case No. 15-CV-00182-WJM-KLM.
11  Would counsel please state your appearances for
12  the record.
13       MS. PASSAMANECK:  This is Nora
14  Passamaneck of the law firm of Wilmer Hale
15  representing plaintiff, John Michael Broadus.
16       MR. RINGEL:  Good afternoon.  This is
17  Andrew Ringel of the law firm of Hall & Evans
18  representing defendant Correctional Health
19  Partners, which is designated in the caption as
20  CHP, paren, Clinical Health Partners, end paren.
21       STEPHEN R. KREBS, M.D.,
22  called as a witness on behalf of the Plaintiff,
23  was sworn and testified as follows:
24       DIRECT-EXAMINATION
25       BY MS. PASSAMANECK:
```



800 E. 1st Street, Suite 305
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913-383-1131

**EXHIBIT A-2**

### Page 21

```
 1  A. That was --
 2     MR. RINGEL: Object to the form of the
 3  question.
 4  A. That was part of that job, correct.
 5     THE VIDEOGRAPHER: There was an
 6  objection.
 7     MS. PASSAMANECK: I'm sorry, was there
 8  another --
 9     THE VIDEOGRAPHER: I was just saying, the
10  court reporter couldn't hear the objection because
11  it was at the same time as the answer so I was
12  just telling the court reporter there was an
13  objection.
14     MS. PASSAMANECK: Okay, very good. I
15  heard a different voice coming from the room.
16     THE VIDEOGRAPHER: Sorry.
17     MR. RINGEL: The objection was to form
18  and foundation.
19     MS. PASSAMANECK: That's fine. I think
20  he understood the question.
21  BY MS. PASSAMANECK:
22  Q. From the 2000 -- let's take 2010 to 2014
23  time range. How much of your time was spent on
24  your practice at Wheat Ridge versus your work with
25  CHP and/or PHP?
```

### Page 22

```
 1  A. Roughly 50/50.
 2  Q. And how much of your time at PHP and/or
 3  CHP -- I'm sorry, let me strike that. From 2010
 4  to 2014 were you working for CHP or PHP at that
 5  point?
 6  A. So, as -- at one time CHP was a
 7  fully-owned subsidiary and at one time I was the
 8  chief medical director for both corporations. On
 9  any given day I might do 90 percent PHP and 10
10  percent CHP, and the next day I might do 80
11  percent CHP and 20 percent PHP, and the exact
12  balance of my work could only be reflected -- you
13  can look at my pay stubs to see who paid how much
14  of my freight.
15  Q. Were your duties the same for PHP and
16  CHP?
17  A. My duties inside PHP as time went on and
18  I became the chief medical officer was more
19  strategic direction for a medical services
20  organization. Inside CHP my job, in spite of
21  titles or names, was primarily the adjudication of
22  referral process. So, the two companies grew
23  apart and in one company I was more of a strategic
24  thinker, that was PHP. In the other company I was
25  much more of a worker bee and that was CHP.
```

### Page 23

```
 1  Q. Okay. Have you taken -- strike that. Is
 2  it fair to say that CHP is a third party
 3  administrator that's contracted to determine the
 4  medical necessity of outside medical care for
 5  inmates?
 6     MR. RINGEL: Object to the form.
 7  A. So, do I answer that, Andrew? You
 8  objected. Okay.
 9     MR. RINGEL: Yeah, so, Doctor Krebs,
10  unless I instruct you not to answer I'm just
11  objecting for the record because there's no judge
12  here, but go ahead and answer that question.
13  A. Actually I believe CHP considers itself a
14  clinically-enhanced third party administrator, so,
15  affirmative.
16  BY MS. PASSAMANECK:
17  Q. And what do you mean by
18  clinically-enhanced third party provider?
19  A. I -- since I didn't come up with that
20  terminology I don't believe I'm going to define
21  it.
22  Q. You used that phrase, correct?
23  A. I did use that phrase. That doesn't mean
24  I made it up and it doesn't mean that I'm
25  responsible for what it means.
```

### Page 24

```
 1  Q. And you have no personal understanding
 2  for what that phrase means?
 3  A. I, I think the flavor of the response is
 4  that, that in the marketing components of CHP the
 5  idea was is that CHP had some clinical knowledge
 6  and wasn't just a system of bureaucrats and
 7  therefore globally could be trusted to provide
 8  these decisions.
 9  Q. And you said you were familiar with the
10  determinations for approval or denial of outside
11  care for inmates by CHP, correct?
12  A. I -- up until the time I left that is
13  correct.
14  Q. Correct. Can you explain up until the
15  time you left on how that process works?
16  A. So, CHP is a medical services
17  organization, CHP is not a care provider. We, for
18  the Colorado Department of Corrections we don't
19  provide any care, so, our job was to evaluate
20  information that was sent to us for medical
21  necessity for a variety of requested referrals.
22  We were given specific information and we were
23  asked to make a decision based on that provided
24  information and we were to do it based on clinical
25  guidelines and some unique correctional overlays
```



800 E. 1st Street, Suite 305　　　　5111 SW 21st Street　　　　6420 W. 95th Street, Suite 101
Wichita, KS 67202　　　　　　　　 Topeka, KS 66604　　　　　　　Overland Park, KS 66212
316-201-1612　　　　　　　　　　 785-273-3063　　　　　　　　　 913-383-1131
　　　　　　　　　　　　　　　　　www.appinobiggs.com

Page 25

1 and then we were asked to make decisions.
2   Q. Did you have -- strike that. So, a
3 prison would give you information regarding a
4 patient to evaluate and determine whether they
5 should have certain outside care, is that fair?
6   A. A request for a specific service along
7 with attached clinical information would be sent
8 to us in a unified format. We were to evaluate
9 the information within that format and based on
10 the information contained in that format make a
11 decision whether a service requested was
12 appropriate or not based on that snippet of
13 information.
14   Q. Was it specific -- were the providers
15 filling out a specific form for CHP?
16   A. There was a specific set of data that
17 they were to complete and that contained clinical
18 information. The form took a variety of
19 appearances depending upon whether it was
20 handwritten, which it was initially, or whether it
21 was entered in the computer; but it was all the
22 same stereotypical format.
23   Q. So, you'd receive this form and then make
24 a determination based on the information provided?
25   A. That's correct.

Page 26

1   Q. Did you ever speak with providers
2 personally?
3   A. No. I mean, regarding these particular
4 referrals in general the answer is no. Now, the,
5 the caveat to that is, is we would have
6 educational meetings where we would go to the
7 prisons in order to help them more thoroughly
8 understand the process by which they could perform
9 their requests. You know, you have, you have to
10 educate anyone using a tool how to best use it
11 and, so, you know, they would ask you questions
12 about, well, I had this referral and it got
13 denied, what should I have said. I talked to
14 providers at that moment, but that was about the
15 general concept of the referrals. We didn't
16 discuss the individual referrals with the
17 providers on the phone, no. We got the form on
18 the computer and we were asked to make the
19 decision.
20   Q. You never asked for additional
21 information from a provider?
22   A. The, the system developed and, and at the
23 behest of the State was that we were to make a
24 decision provided the information allowed. If
25 there was inadequate information to support a

Page 27

1 referral, then the referral was denied for lack of
2 adequate support for need. No, we did not call
3 back and say, do you have this or do you have
4 that. We got -- my partners and I referred to it
5 as being the chimp in the box. The screen flashed
6 in front of the chimp, the chimp looked at the
7 screen, the chimp made the decision, the chimp
8 pushed the button, and off it went.
9   Q. Okay. So, it was a yes or a no?
10   A. Yep.
11   Q. Denied or approved?
12   A. Yep, based on what was on that form and
13 that's all we got.
14   Q. So, you had no ability to suggest
15 alternative care?
16   A. No. Actually the way the system was set
17 up they didn't want us to do that and, so, we
18 didn't. We didn't make suggestions. I got a --
19 the chimp gets two decisions: Yes or no. The
20 chimp decides, the referral moves on.
21         MS. PASSAMANECK: Okay. I'm just going
22 to get a quick refill if you don't mind.
23         THE VIDEOGRAPHER: Do you want me to go
24 off the video at all?
25         MS. PASSAMANECK: I will hop back in ten

Page 28

1 seconds.
2         THE VIDEOGRAPHER: Sounds good.
3         (THEREUPON, there was a discussion held
4 off the stenographic record.)
5   BY MS. PASSAMANECK:
6   Q. Did you ever go -- did you ever -- strike
7 that. Did you ever personally do these
8 educational sessions with the providers?
9   A. Over a number of years I attended a
10 number of these educational sessions.
11   Q. Do you know how often they were offered
12 to each prison?
13   A. They were ad hoc. There wasn't -- we
14 didn't have a specific schedule or a specific
15 timetable. I guess the best explanation was that
16 it was based on hot spotting. Oftentimes the
17 medical director for the Department of Corrections
18 would provide data for us and say, wow, it seems
19 like a lot of referrals out of this place are
20 being denied. I looked at them, their information
21 maybe isn't as ideal as it could be, could you
22 come do an educational event, and then we would
23 attend a provider meeting and do an ad hoc
24 educational event.
25   Q. Are you aware of any hot spotting ever


Appino & Biggs Reporting Service, Inc.

800 E. 1st Street, Suite 305          5111 SW 21st Street          6420 W. 95th Street, Suite 101
Wichita, KS 67202                     Topeka, KS 66604             Overland Park, KS 66212
316-201-1612                          785-273-3063                 913-383-1131
                                      www.appinobiggs.com

Page 29

1 occurring in Sterling Correctional Facility?
2    A.  Now we're going back a decade. I went to
3 one educational event, but I don't remember
4 whether it was Sterling or Limon.
5    Q.  And those educational events would only
6 be in response to hot spotting or would they be
7 generally scheduled?
8    A.  So, when we -- when -- now, we're going
9 back to the beginning of CHP and the medical
10 director for the Colorado Department of
11 Corrections was a physician named Cary Shames and
12 this was the introduction of medical management
13 inside Colorado Department of Corrections and at
14 that time it was an entirely new system and over a
15 one-year period that first year we visited all the
16 big prisons and met with all the providers. That
17 was in the initial year or year and a half. At
18 that time CHP was still a fully-owned subsidiary
19 of PHP, and we'd have to go back to see when that
20 date was. After that it became much more ad hoc
21 and part of the reason it was ad hoc was CHP -- I
22 mean, Colorado Department of Corrections provider
23 meetings were ad hoc and, so, we tried to
24 piggyback on their meetings to have the most
25 number of providers there. They would say we're

Page 30

1 going to have a big provider meeting in Pueblo on
2 this date, will you come, and there might be
3 providers from multiple different prisoner -- I
4 mean, from different prisons there and hear the
5 same presentation.
6    Q.  Okay. We've been using the word
7 medically necessary. What is your understanding
8 of that term?
9    A.  So, medically necessary as, as was
10 expected of us was -- so, let me first give you a
11 caveat. At the time I was the medical director
12 the Colorado Department of Corrections was a
13 nonrehab state, which meant if an inmate came in
14 with a medical process we were told it was not our
15 responsibility that the patient left in
16 dramatically better condition than they came in.
17 So, if you came in and you were missing a finger
18 it was not the Colorado Department of Correction's
19 responsibility to have a finger transplanted back
20 on your hand. That's a particularly exuberant
21 example; but if the patient came in with a problem
22 we weren't required to fix it. So, for instance,
23 if you came in with a bad knee, if you came in
24 with an ACL tear, that was a preexisting
25 condition, we weren't required to fix those. So,

Page 31

1 medically necessary were those things necessary to
2 provide good basic health care so that a person
3 could remain healthy and so that prisoners could
4 continue to perform their ADLs in their
5 environment. So, they had to be able to get to
6 and from chow line, they had to be able to get in
7 and out of their bunk. If they had a job in the
8 prison they were expected, if possible, to be able
9 to get back to their job and they were expected to
10 have the same sort of base quality health care any
11 other American would have -- control your blood
12 pressure, manage your diabetes, lower your heart
13 disease risk. You know, anything that was basic
14 medical care.
15    Q.  Now, you said something about you were
16 not required to fix pre-existing conditions,
17 correct?
18    A.  Correct.
19    Q.  How about conditions that an inmate
20 obtains at prison?
21    A.  We were -- again, the, the idea was is
22 that the individual needed to be able to where
23 possible function in the ADLs, activities of daily
24 living of their environment; so, the patient
25 needed to be able to walk to and from chow, get in

Page 32

1 and out of his bunk, go to and from library and
2 attend classes. We were not required to restore
3 people to athletic greatness. So, there were
4 cases where patients ruptured a muscle lifting
5 weights and if their activities of daily living
6 were not impaired, we were instructed not to
7 authorize those because they were not required for
8 basic health care or activities of daily living.
9    Q.  You mentioned they did not allow this.
10 Who is the they?
11    A.  Well, the original, the original concept
12 of activities of daily living, medical management
13 using criteria Milliman or Milliman-like and the
14 correctional overlay was developed by Cary Shames,
15 the chief medical officer at Colorado Department
16 of Corrections, and the process he set in motion
17 continued until at least up until the time I left.
18    Q.  So, you were following CDOC procedures in
19 making these determinations?
20    A.  Fundamentally CDOC set the whole system
21 up and all the rules for us and we followed the
22 CDOC's rules. CHP didn't make any rules.
23 Colorado Department of Corrections gave us a rule
24 book by which we adjudicated cases.
25    Q.  Now, what are -- you mentioned some ADLs,



800 E. 1st Street, Suite 305
Wichita, KS 67202
316-201-1612

511 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913-383-1131

### Page 37

1  you know, I want do the right thing. This is what
2  Milliman says, tell me what they're telling me.
3  So, it was a, it was a reference for unusual cases
4  and it provided an initial training guideline for
5  medical directors inside CHP and it provided a
6  format by which, you know, if, if a provider
7  called you up and said, every time I send you an
8  echocardiogram you tell me no, why are you telling
9  me no every time, you could say, well, why don't
10 you go look at the Milliman guideline that you
11 have access to for appropriateness of
12 echocardiograms. You'll notice that you should
13 probably never order an echocardiogram without
14 doing an EKG first and every time I say denied, no
15 EKG, please refer to the Milliman Guideline. Now,
16 we didn't do that with every referral. We would
17 do that at a provider meeting where they would
18 pull you aside and say, Krebs, you keep squashing
19 my blank referral, why do you squash my referral?
20 Then you'd say, well, you're not putting this in
21 there, and without this I can't authorize it. So,
22 go look, here's the Milliman, and then they'd, you
23 know, some of them would say, wow, okay, now I
24 know what I need to do. So, at least it was a
25 unified point at which clinicians could refer back

### Page 38

1  and forth.
2    Q. And after a period of time you did not
3  need to use the Milliman Guidelines for all of
4  your cases?
5    A. After, after a certain period of time it
6  would have been a waste of time because you had
7  read the guidelines so many times it was, you
8  remembered it.
9    Q. So, you're aware in this case Mr. Broadus
10 was denied an MRI for his knee injury, correct?
11   A. Since I denied it I'm aware of that.
12   Q. Okay. Excellent. Are you familiar with
13 the Milliman Guidelines for determining whether an
14 MRI is medically necessary to diagnose a knee
15 injury?
16   A. Again, those are guidelines, but yes, I
17 have in my life read the Milliman Guideline for
18 MRI diagnosis of the knee.
19   Q. And what are those guidelines looking for
20 to determine whether or not an MRI is medically
21 necessary?
22       MR. RINGEL: Object to the form.
23   A. You can read those guidelines as easily
24 as I can and they're available to you.
25      BY MS. PASSAMANECK:

### Page 39

1    Q. And where are they available, sir?
2    A. In Milliman. I'm sure Andrew would be
3  happy to get you the Milliman Guidelines for MRI
4  of the knee.
5       MS. PASSAMANECK: Counsel, I will ask for
6  those guidelines, please, especially if they were
7  used in this case. I think they're responsive to
8  our document request.
9       MR. RINGEL: I don't know whether they're
10 responsive or not. I don't think you sent us a
11 document request, but send me an E-mail and I'll
12 respond.
13      MS. PASSAMANECK: Okay. I looked online
14 and they're only behind pay walls, so --
15      MR. RINGEL: Yeah, I don't have any
16 problem providing it. I will tell you that it's
17 my understanding that I'm likely only to be able
18 to access the current version, but I would also
19 say I doubt --
20      MS. PASSAMANECK: It's changed
21 significantly?
22      MR. RINGEL: -- it's changed
23 significantly related to knee injuries and MRIs.
24      MS. PASSAMANECK: Okay.
25   A. To give you a general answer to your

### Page 40

1  question, there should be significant exam
2  dysfunction present at the time of presentation
3  such that you have a high pretest probability that
4  the MRI will show an abnormality.
5       BY MS. PASSAMANECK:
6    Q. What do you mean by significant exam
7  dysfunction?
8    A. So, for instance, a knee -- an internal
9  derangement of the knee that in some cases
10 requires surgical intervention is an ACL
11 disruption and in ACL disruption there are obvious
12 clinical abnormalities in the knee. The knee
13 within minutes is blown up and profoundly swollen
14 and it's extremely tender and it has remarkably
15 decreased mobility and it has remarkably decreased
16 strength. It's unstable. For instance -- so, an
17 unstable knee with a large effusion and loss of
18 significant strength is suggestive of an ACL
19 disruption. Now, in many cases ACLs are repaired
20 at the current time, although with all fairness,
21 that orthopedic mandate is being revised. So,
22 you're looking for significant exam dysfunction at
23 the, at the time of the exam.
24   Q. Do you consider the length that a patient
25 has had the injury in determining whether an MRI



800 E. 1st Street, Suite 305
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913-383-1131

### Page 41

1 should be permitted?
2    A. So, unless you're a professional athlete,
3 whether you have either a meniscal repair now or
4 in nine months or an ACL repair nine -- now or in
5 nine months, the clinical outcome is the same.
6 So, the duration potentially of the symptom, while
7 tremendously important to the patient and pain
8 relief is its own appropriate target, the duration
9 of the symptom is not necessarily at all a driver
10 of whether an MRI is or is not appropriate.
11    Q. Is pain relief -- I'm sorry, strike that.
12 Is treatment for pain relief -- strike that. If
13 an inmate is suffering pain, what level of pain is
14 -- is there ever a point where treatment for that
15 pain is medically necessary?
16      MR. RINGEL: Object to the form,
17 foundation.
18    A. So, I would argue that in any human being
19 there's some level of pain which pain in and of
20 itself should be treated. That -- you've stumbled
21 on a terrifying and subjective area in medicine.
22 You know, you can inflict enough pain on any human
23 being that of course pain relief becomes
24 completely appropriate. What is that level of
25 dysfunction that produces that level of pain is a

### Page 42

1 variable between different human beings and that's
2 part of the challenge of the variability of human
3 beings.
4    Q. Well, what triggered my question is you
5 mentioned whether you get an ACL repair, you know,
6 a week or nine months later the result will be the
7 same, and then you mentioned the fact there's pain
8 potentially in there, correct?
9    A. Yes. Shortly after an ACL disruption
10 there is terrific pain. A surgical repair doesn't
11 alleviate that pain. Anti-inflammatories, icing,
12 the passage of time alleviates that pain. The
13 surgical procedure contemplated is not a pain --
14 is not a pain-relieving tool.
15    Q. And what is the surgical procedure then
16 to do?
17    A. If you have an ACL disruption and you're
18 a professional basketball player and dunking is
19 necessary as part of your job, then you reunite
20 the ACL so that the knee is as functional as it
21 was when you were an athlete. John Elway played
22 his second Super Bowl win with no ACL and no
23 medial collateral and no medial meniscus. So, I
24 mean, even, even the presence of an intact ACL is
25 not necessary for a high level of athletic

### Page 43

1 performance. So, it is variable in different
2 human beings. Each individual is their own person
3 and you have to treat an individual based on their
4 unique pain and their discomfort and what their
5 ADLs are and what their goals are and where
6 they're headed in life and what their age is and
7 that's the art of medicine in seeing a patient and
8 providing the right care at the right time.
9    Q. Are you familiar with the McMurray's
10 test?
11    A. Yeah, I'm familiar with the McMurray's
12 test.
13    Q. And what is it?
14    A. Functionally McMurray's test is the
15 patient lies on their back, they bend their knee
16 and you apply valgus force and if the person has
17 discomfort over the meniscus in question, then
18 that is suggestive that there may be meniscal
19 pathology. The sensitivity and specificity of
20 McMurray's test is 50 percent, which means it's
21 wrong as much as it is correct.
22    Q. What is the -- I believe it's a Lachman's
23 test --
24    A. Yeah, Lachman's test is, is basically --
25 there are several ways to do it. You can do it

### Page 44

1 with the patient lying on their back or you can do
2 it with the patient sitting and their leg
3 dependent and functionally it's, with the femur
4 extended and immobile, moving the tibia forward or
5 back against the femur and that tests the anterior
6 cruciate and the posterior cruciate. Lachman's
7 test is more sensitive and specific for ACL than
8 McMurray's test is for medial meniscal, but
9 they're, they're allied tests looking at different
10 parts of the knee.
11    Q. Is a positive Lachman test on its own
12 sufficient to warrant an MRI?
13    A. No.
14    Q. And you said the same for McMurray's,
15 correct?
16    A. So, again, a really good orthopedist can
17 probably diagnose an ACL tear with a Lachman's
18 test and never need an MRI. McMurray's test,
19 since the specificity and sensitivity is a
20 crapshoot, is not considered particularly actually
21 clinically helpful at the present time.
22    Q. Under the Milliman Guidelines is there
23 any one factor that would be sufficient to warrant
24 an MRI?
25    A. There's no single factor that would be



800 E. 1st Street, Suite 305     5111 SW 21st Street     6420 W. 95th Street, Suite 101
Wichita, KS 67202     Topeka, KS 66604     Overland Park, KS 66212
316-201-1612     785-273-3063     913-383-1131
www.appinobiggs.com

Page 49

1   A. 020?
2   Q. 0017 through 0020. It's the next pages
3 after 1 through 8.
4   A. Yeah. So, I recognize -- I think these
5 are in this packet, but as they did not appear
6 germane to me I did not review them.
7   Q. Do you know what these documents, these
8 pages are?
9   A. I have no idea what these are. The 0017
10 through 0051, prior to this whole deposition event
11 I've never seen these before.
12   Q. Let's turn to CHP0007, and is this a
13 utilization review dated March 25th, 2014?
14   A. Yep.
15   Q. And is this for John Broadus, correct?
16   A. John Broadus, correct.
17   Q. So, going down to past treatment
18 comments, there is a large paragraph after that.
19 Do you see that?
20   A. I'm looking for past treatment comments.
21   Q. It says -- it's request type, outpatient
22 diagnostic, diagnosis 719.46, pain in joint,
23 comma, lower leg and then there's past treatment
24 comments, colon. It's on --
25   A. Is it in the text, the paragraph?

Page 50

1   Q. Yes. It's that text, that paragraph of
2 text. Do you see the paragraph of text?
3     MR. RINGEL: Doctor, the one that begins
4 CDOC request and then has a number.
5     THE WITNESS: CDOC.
6     MR. RINGEL: It's the biggest paragraph
7 on the form.
8     THE WITNESS: Right, I see the paragraph.
9 He's talking about --
10     BY MS. PASSAMANECK:
11   Q. That's the paragraph we're talking about.
12   A. Okay, okay. Then yes, I see that.
13   Q. This paragraph of text, is that the
14 information CHP received from Sterling?
15   A. I don't know if it came -- I'm going to
16 assume it came from Sterling 'cause it says it
17 came from Sterling. This would be the -- this
18 text would be what was provided to me, the
19 physician, to make the review. Just so you guys
20 are aware, everything that's above this header, we
21 didn't see that. We didn't know if they were in
22 Sterling or in Limon. We had no idea where they
23 were. The prison they were in was agnostic to us,
24 and the bottom part is post adjudication where it
25 says denied, so, that wouldn't appear on our

Page 51

1 screen either. So, you see one, two, three, four,
2 five big horizontal black lines. What occurred
3 between the fourth and the fifth horizontal black
4 line is a facsimile of what I would have seen as
5 the chimp in the box.
6   Q. So, your job is to read this paragraph of
7 information and make the determination for whether
8 or not Mr. Broadus gets an MRI?
9   A. That's correct.
10   Q. See if we can tie this back to the other
11 documents. If you'd turn, in this set of
12 documents, going back to CHP0048.
13   A. You mean 008? I don't think there is a
14 0048.
15   Q. 48. Further back and toward the end of
16 that document.
17   A. Okay.
18     MR. RINGEL: The second to last page.
19   A. I see 49. Okay, I see 0048.
20     BY MS. PASSAMANECK:
21   Q. The one before that.
22   A. Yep.
23   Q. Excellent. This seems to be some kind of
24 spreadsheet, but if you look there is three
25 different columns. There's off ID, created

Page 52

1 date/time, and then no column name. Do you see
2 those titles at the top there?
3   A. I do.
4   Q. Okay. In the created date/time there is
5 2014-3-25. Do you see that?
6   A. I do.
7   Q. And, so -- and then on the third column
8 there is information, it says clinical information
9 -- there's a CDO request 1, clinical information,
10 colon, consulting for an MRI and obtaining x-ray.
11 Do you see that?
12   A. I do.
13   Q. Is this the information you would receive
14 from Sterling --
15   A. No.
16   Q. -- with a medical request?
17   A. No. I did not receive this information.
18 This is a format I as a medical director never
19 saw.
20   Q. Okay.
21   A. This is completely -- I have no knowledge
22 of this form prior to you pointing this out to me.
23   Q. Okay. So, we'll go back to the
24 utilization review CHP007. Since you haven't seen
25 it I won't ask you.


Apping-Biggs Reporting Service, Inc.

800 E. 1st Street, Suite 305     5111 SW 21st Street     6420 W. 95th Street, Suite 101
Wichita, KS 67202     Topeka, KS 66604     Overland Park, KS 66212
316-201-1612     785-273-3063     913-383-1131
www.appinobiggs.com

Page 57

A. Yeah, in and out of a chair is worse. The sheer forces on a knee injury are infinitely worse getting in and out of a chair. Once you're up it isn't that bad.

Q. So, we look at the sentence that says ambulates with antalgic gait favoring the right leg.

A. Right.

Q. Then there is, after that, right knee tender to palpation with swelling, no deformity, erythema or signs of infection as compared bilaterally. Do you see that?

A. Yep, I sure do.

Q. Are these subjective or objective observations?

A. No, that should be -- that should be objective evaluation because swelling, deformity and erythema are physical signs that require you put your hands on the person's knee. Now, I also point out, you'll notice it says the strength is five over five with flexion and extension bilaterally. You automatically always splint with an internal derangement of the knee of significance. This guy has completely normal strength. That's not -- that's inconsistent with

Page 58

an internal derangement of the knee of significance.

Q. And for those us in plain English to understand meniscal tear, this internal derangement, is that the same thing as --

A. Well, an internal derangement could be a meniscal tear, it could be an ACL disruption, it could be a little piece of a torn cartilage floating around called a joint mouse, it could be a medial ligament disruption. It's anything that's inside the joint capsule. The joint capsule includes all of the internal compartments of the knee, so, you can't injure one part and -- I mean, as soon as there's debris floating around in the knee it circulates everywhere inside the capsule, so, the signs and symptoms are often very similar. It's swollen, it's red, it hurts, I can't move it, I can't flex it, I can't extend it, and then you have to start to do more clinical work to figure out what the injury is; but those signs are common with any injury.

Q. Looking at this paragraph, is there any other information that informed your decision to deny the MRI?

A. Well, so, this is, this is hard. The guy

Page 59

says his knee hurts, but I have two areas that if I, that if I pay objective information -- I pay objective attention to, he walks in and sits down without difficulty, he's able to get in and out of a chair without difficulty, and his flexion and extension are normal. He has just proven to me that he can do all of his ADLs, so, the ADL argument is out the window. Dude can do his ADLs. Now, he has subjective pain, that's subjective. I can't say that he's not having pain, but I can say that based on this referral, the probability that he has a significant internal derangement of his knee is very small. Now, he also hasn't really been treated. I'm not aware that he's taken anti-inflammatories, doesn't say anything about that he's seen a physical therapist. So, so, no, an MRI is absolutely not appropriate in this case. It's not medically needed and the guy hasn't been treated. This would be in any system a colossal waste of a resource.

Q. Did you refer to the guidelines in denying this or was it so clear that you did not need to?

A. I didn't look at the guidelines on this. This is so obvious that there was no reason to

Page 60

look.

Q. Okay. Let's turn to CHP002. This is a utilization review dated June 2nd, 2014. Do you see that?

A. Yep.

Q. And, so, this is five or six weeks after the last request, correct?

A. Well, it's -- this is whatever the date is. I mean, you could count the exact number of days; but yes, this is a sequential referral that follows the other one after some passage of time.

Q. And is this considered a separate referral or do you look back at the first referral as well?

A. Each referral is considered independently and of its own, so, the answer is no, you don't go -- again, the chimp in the box gets the flash on the screen. We're not required to keep the patient's medical history. I mean, so, for instance, the reason for that is -- a gross example is what if some -- a patient had something that PHP adjudicated five years ago that actually might be germane to their referral? That's the provider's responsibility to put it in the referral. I don't have his medical record. I'm

Appino & Biggs Reporting Services, Inc.

800 E. 1st Street, Suite 305
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913-383-1131

### Page 61

1 not required to look at the 30,000 other referrals
2 he has. The chimp looks at what flashes in front
3 of him and makes a decision.
4 　Q. So, the only thing that flashed in front
5 of you, like last time, would be the paragraph of
6 text following past treatment comments, is that
7 correct?
8 　A. That's correct.
9 　Q. Okay, and I realize I did my math wrong,
10 it's about nine weeks after the previous --
11 　A. Right.
12 　Q. -- denial. Okay, and again he's
13 consulting for an MRI of his right knee and
14 needing further evaluation of joint damage. Do
15 you see that?
16 　A. Correct.
17 　Q. And as of this time he's still ambulating
18 with antalgic gait, do you see that?
19 　A. Yep.
20 　Q. It's the next --
21 　A. Uh-huh. Uh-huh.
22 　Q. And he reported that he was wearing a
23 knee brace?
24 　A. Yep. Says he's wearing -- says he's
25 wearing a knee brace.

### Page 62

1 　Q. And he's been taking pain medications it
2 says here?
3 　A. I'm looking for that, but I do recall
4 that.
5 　Q. It's right after pain medications.
6 　　MR. RINGEL: Right after the brace.
7 　A. Yep, yep, yep.
8 　　BY MS. PASSAMANECK:
9 　Q. Right after the brace.
10 　A. Uh-huh.
11 　Q. And it also reports that he stated that
12 he's done physical therapy on his own with little
13 relief?
14 　A. I see that.
15 　Q. You see that?
16 　A. Yep.
17 　Q. Are these considerations -- I'm sorry,
18 strike that. Are these symptoms that you take
19 into consideration in determining whether an MRI
20 is appropriate?
21 　A. Again, the entire picture -- you always
22 have to objectively look at the entire picture and
23 I'd be disingenuous if I were to say, geez, the
24 guy's had symptoms a longer period of time, does
25 that not at least enter into your thinking. Of

### Page 63

1 course it enters into your thinking. You know,
2 it's a human being, he's having discomfort, it's
3 been persistent, so, yes, you've got my attention.
4 I'm paying attention. Does he need an MRI?
5 　Q. And this says will send encounter from --
6 I'm sorry, encounter form 3-25-14.
7 　A. Right. So, that's, by the way, a no-no
8 inside CDOC. When you send a new referral you're
9 supposed to send a new exam. Based on procedures
10 provided by us from CDOC, if there's no new exam,
11 it means no, there's no meaningful exam. So, in
12 this, unfortunately, no new exam is provided, so,
13 I have no new information that his knee is more
14 swollen or it's more red or that his range of
15 motion is decreased or that he's weak or he can't
16 get out of a chair. I have nothing, and, so, in
17 the, what we're provided, the rule book we're
18 provided by Department of Corrections, that counts
19 against this referral because you're trying to
20 build the case for any needed referral and
21 fundamentally in the exam section in this
22 particular flash to the chimp, exam is empty. So,
23 I have to assume it's normal. I'm not allowed to
24 assume that it's abnormal. All I'm allowed to
25 assume is what I'm told. So, the exam section in

### Page 64

1 this is older, so, I could procedurally just throw
2 this referral out because it has no exam. I could
3 say denied, no exam provided, will not
4 procedurally consider this referral. That's not
5 what we did, but you could.
6 　Q. If you'd done that, that would have
7 indicated they should have done an exam, though,
8 correct?
9 　A. Well, they should have done an exam.
10 They're told to do a new exam with every referral,
11 right? That's not my job to tell them that and
12 they're also -- they're also informed in the
13 educational meetings that if you don't provide new
14 information, if you basically provide the same
15 referral, you're going to get the same
16 adjudication.
17 　Q. Well, the next sentence, the subjective
18 colon: X-rays returned and showing no evidence of
19 bone damage?
20 　A. Uh-huh.
21 　Q. So, there's some new information --
22 　A. There's an x-ray. There's an x-ray and
23 it's normal, so, that doesn't build the case for
24 an MRI.
25 　Q. And then again it says, refer to



Appino & Biggs Reporting Service

800 E. 1st Street, Suite 305　　5111 SW 21st Street　　6420 W. 95th Street, Suite 101
Wichita, KS 67202　　Topeka, KS 66604　　Overland Park, KS 66212
316-201-1612　　785-273-3063　　913-383-1131
www.appinobiggs.com

### Page 65

1 examination and appointment on 3-25-14.
2  A.  Which did not support an MRI.
3  Q.  Did you refer back to the appointment on
4 3-25-14?
5  A.  No, because the chimp in the box didn't
6 get that.
7  Q.  Then there is: Will fax encounter to
8 PHP, x-ray, colon, 3-27-14, do you see that?
9  A.  I did, yes. So, they're required to
10 prove that they actually did an x-ray, so,
11 somewhere in our system there will be the
12 verification of the x-ray report. She has
13 provided the interpretation in the text of the
14 document. As part of their referral if there's
15 new information they're required to attach that
16 data. That was not sent with this, but it would
17 be somewhere in the system.
18  Q.  Did you review the actual x-ray report
19 before denying this MRI?
20  A.  I reviewed her x-ray interpretation.
21 That -- it says A/P and lateral radiographs were
22 obtained, osseous alignment is normal. There's no
23 significant joint space or loss of osteophytes, no
24 radiographic findings are present to explain
25 patient's right knee pain. That's the

### Page 66

1 radiologist's interpretation. She just typed it
2 into the report. So, yes, I reviewed that. I
3 reviewed the radiologist's interpretation, which
4 is what would have been printed on the
5 radiologist's form.
6  Q.  You would have -- would you expect the
7 x-ray to be normal if there was a meniscal tear?
8  A.  Actually you would expect -- the x-ray
9 doesn't help us with meniscal tear. Now, an x-ray
10 would help you with a subchondral bone lesion,
11 which might drive you to do an MRI, or
12 osteonecrosis of the knee, which would drive you
13 to do an MRI; so, you could do a plain radiograph
14 and that would support the need for an MRI.
15 Remember, we're trying to build a case for the
16 requested service; but unfortunately, this piece
17 of data doesn't refute a meniscal tear, but we've
18 already decided we don't need an MRI for meniscal
19 tear, but it doesn't provide any veracity that an
20 MRI is needed.
21  Q.  At the very end there's, do you see the
22 last two lines, approval specification/comments,
23 colon, 6-13-2014, colon, denied, no objective
24 impairment of ADLs noted, and SRK?
25  A.  Right, yep.

### Page 67

1  Q.  And that's SRK --
2  A.  That's me.
3  Q.  -- Stephen R. Krebs?
4  A.  That would -- I mean, I don't remember
5 typing that, but I'm pretty sure the chimp typed
6 that because it's got the chimp's initials.
7  Q.  Okay, and no other chimps with your
8 initials working for CHP?
9  A.  The only other chimp had different
10 initials.
11  Q.  Is ambulating with an antalgic gait an
12 ADL, an impairment of an ADL?
13  A.  No. If you said the patient's antalgic
14 gait prevents him from getting to and from chow
15 line, getting in and/or out of his bunk or going
16 to and from his job, maybe, but it says he's
17 walking. I walk with an antalgic gait. I worked
18 19 hours and admitted 18 patients last night. An
19 antalgic gait doesn't mean you can't work like
20 hell; so, no, that -- did I answer your question?
21  Q.  Yes. Yes, you did. Let's turn to CHP --
22 this is the first page of this exhibit. This is
23 dated 9-16-2014, another utilization review for
24 John Broadus. Do you see that?
25  A.  I do.

### Page 68

1  Q.  Okay, and here they're requesting
2 physical therapy, correct?
3  A.  Right.
4  Q.  And this was approved as submitted,
5 correct?
6  A.  Uh-huh.
7  Q.  Did you approve this?
8  A.  No. Again, we only got them if they
9 obviously fell out of Milliman criteria and
10 Milliman criteria for a suspected meniscal injury,
11 physical therapy is actually indicated. The
12 nurses didn't even have to ask us. They just
13 authorized it. I mean, if it's clearly within
14 that care guideline that's obviously appropriate
15 and necessary, never came to the docs. So,
16 finally this provider maybe read Milliman and
17 said, wow, physical therapy really works for a
18 meniscal injury, and asked for physical therapy
19 and got it and then that -- this is the end of the
20 story as far as I know. I don't know what
21 happened; but, you know, they asked for an
22 appropriate service and it was indicated and it
23 was authorized.
24  Q.  Was physical therapy medically
25 appropriate back in March for the injury?

Appino & Biggs Reporting Service, Inc.

800 E. 1st Street, Suite 305
Wichita, KS 67202
316-201-1612

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street, Suite 101
Overland Park, KS 66212
913-383-1131

Page 69

1   A. If they had asked for it I certainly
2 would have provided it.
3   Q. And same thing for June?
4   A. Yeah, sure, absolutely.
5   Q. This is, this is an issue of CDOC not
6 asking for the right relief for Mr. Broadus?
7   A. We're not allowed to suggest care. We're
8 not allowed to suggest care. I mean, it's
9 different, if I was Jiminy Cricket whispering in
10 that provider's ear with the first event I would
11 have said, listen, give the guy some
12 nonsteroidals, ice the knee for a while, get him
13 in to see physical therapy, get him doing his
14 physical therapy every day and see him back in six
15 weeks. That would have been ideal; but we don't
16 provide care, we don't suggest care, so, we have
17 to wait until they bump into the right thing and
18 then we can authorize it.
19   Q. And there's no way that you can help to
20 get them to the right thing?
21   A. Well, that would be providing care and we
22 don't do that.
23   Q. Now, for the two denials that we just
24 discussed, do you know what happened after you hit
25 the denial button?

Page 70

1   A. I suspect the provider got a denial
2 message. I mean, what happened for the chimp is
3 the next referral flashed across the screen.
4 That's it. I mean, I make an adjudication and
5 it's gone in the ethereal mist and until it comes
6 back in this sort of boomerang I have no knowledge
7 of what happened to the thousands of referrals I
8 did over the years.
9   Q. So, you have no idea how that gets
10 transmitted to Sterling Correctional Facility?
11   A. I'm going to guess electronically? I
12 honestly don't know. I know in the early years we
13 had to fax all this nonsense. Later it became an
14 electronic interchange. When exactly that was I
15 don't know. Whose mailbox it went to, who opened
16 the E-mail, I have no knowledge of that. My job
17 was --
18   Q. And you don't know --
19   A. -- yes, no next.
20   Q. Do you know whether this information is
21 provided to the inmate?
22   A. I have no knowledge of that.
23       MS. PASSAMANECK: Let's go off the record
24 for a minute. I just want to read over my notes.
25 We may be close to the end here.

Page 71

1       THE VIDEOGRAPHER: It's 4:36 p.m., we're
2 off the record.
3       (THEREUPON, an off the record discussion
4 was held.)
5       THE VIDEOGRAPHER: It is 4:38 p.m., we're
6 back on the record.
7       MS. PASSAMANECK: I have no further
8 questions.
9       MR. RINGEL: This is Andrew Ringel. I
10 don't have any questions of Doctor Krebs today.
11       MS. PASSAMANECK: Well, thank you very
12 much for your time, Doctor Krebs, especially after
13 your long day.
14       THE REPORTER: Do you have reading and
15 signing in Colorado?
16       MR. RINGEL: We do. I will take care of
17 review and signature when you send me a copy.
18       THE REPORTER: Great, sounds good. Thank
19 you.
20       THE VIDEOGRAPHER: It is 4:39 p.m., we're
21 going off the record. This concludes the
22 deposition.
23       (THEREUPON, the deposition concluded at
24 4:39 p.m.)
25 .

Page 72

1           SIGNATURE
2 .
3      The deposition of STEPHEN R. KREBS, M.D.
4 was taken in the matter, on the date, and at the
5 time and place set out on the title page hereof.
6 .
7      It was requested that the deposition be
8 taken by the reporter and that same be reduced to
9 typewritten form.
10 .
11      It was agreed by and between counsel and
12 the parties that the deponent will read and sign
13 the transcript of said deposition.
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .



800 E. 1st Street, Suite 305     5111 SW 21st Street     6420 W. 95th Street, Suite 101
Wichita, KS 67202     Topeka, KS 66604     Overland Park, KS 66212
316-201-1612     785-273-3063     913-383-1131
www.appinobiggs.com