*John Michael Broadus vs.*

*Chapdelain, et al.*

*Deposition of John Michael Broadus*

*April 12, 2017*



# Stevens-Koenig Reporting

700 17th Street, Suite 1750
Denver, CO 80202
303-988-8470 (Office)   303-988-8478 (Fax)
SKReporting.com

**EXHIBIT A-7**

Page 45

1 this case?
2     A. I haven't conferred with my counsel
3 entirely on that, so I can't answer that right now.
4     Q. Okay.
5        MR. HUSS: I have no further questions
6 right now.
7        MR. RINGEL: You okay to keep going?
8        THE DEPONENT: Yes.
9            EXAMINATION
10 BY MR. RINGEL:
11    Q. Mr. Broadus, we met off the record. My
12 name is Andrew Ringel. I represent Correctional Health
13 Partners, which you have identified in your Amendment
14 Complaint as CHP, Clinical Health Partners.
15    A. Okay.
16    Q. Okay?
17       What is your understanding of what CHP's
18 role is related to medical care for inmates at Sterling
19 Correctional Facility?
20    A. I have no understanding.
21    Q. Okay.
22    A. I do not know.
23    Q. How did you hear of CHP or Clinical Health
24 Provider as a name of somebody that was involved in your
25 medical care in some way?

Page 46

1    A. They were listed on my grievances as
2 having denied my MRI.
3    Q. Okay. And was the -- so someone -- the
4 way that I understand it works is that someone who was in
5 medical would have responded to your medical-related
6 grievance; is that generally true?
7    A. I do not know.
8    Q. Okay. All right. Do you recall what the
9 grievance said about CHP?
10   A. Yes.
11   Q. What did it say about CHP?
12   A. That my MRI was denied by CHP after it was
13 submitted by Provider McKay, I believe.
14   Q. Okay. All right. Do you -- other than
15 the information that you had in the grievance response,
16 do you have any other understanding of what CHP's role is
17 related to medical care?
18   A. No.
19   Q. Okay. Have you had any communications of
20 your own with anyone with CHP?
21   A. No.
22   Q. Okay. Do you know if anyone has had
23 communications with CHP on your behalf?
24   A. I do not know.
25   Q. Okay. All right. My understanding is the

Page 47

1 issue related to CHP, from your perspective, is the
2 failure of them to approve the MRI on your right knee; am
3 I right about that?
4    A. Can you repeat that?
5    Q. Sure.
6       Your claim against CHP has to do with
7 their failure to approve an MRI on your right knee; is
8 that correct?
9    A. Yes.
10   Q. Okay. So let me -- if we could go to
11 No. -- Exhibit 18, your Amended Complaint. If you turn
12 to page 6, where it says No. 4 in the middle of the page.
13 Let me know when you get there.
14      Do you see where I am, where it says No. 4
15 on page 6?
16   A. Oh, I'm sorry. Yes.
17   Q. Okay. So this is where you identify CHP,
18 Clinical Health Provider, as a named defendant in the
19 lawsuit, right?
20   A. That's correct.
21   Q. Okay. And what you are identifying is
22 what you believe, at least initially, what CHP did wrong.
23 Am I right about that?
24   A. It's what I believe CHP's role was at the
25 time. Yes.

Page 48

1    Q. Okay. Fair enough.
2       And then your Claim No. 1 has to do with
3 the medical care, is that right, beginning on page 8?
4    A. No, that's not correct.
5    Q. Okay. Well, let's start talking about
6 page 8.
7    A. Okay.
8    Q. So what I want to understand is the
9 history related to your right knee.
10      Prior to 2014, had you had any injury to
11 your right knee of any kind?
12   A. I do not recall at the time.
13   Q. Okay.
14   A. I'm sorry.
15   Q. Fair enough.
16      What were the types of activities that you
17 would do, sort of physical activities that you would do
18 in prison prior to February of 2014?
19   A. Basketball, sports, running, working out.
20   Q. Okay. Did you have any physical
21 limitations that prevented you from doing those kind of
22 activities?
23   A. I do not believe so.
24   Q. Okay. Did you have any injury to your
25 right knee from any sports that you played before you got

Page 101

1  A.  Right.
2  Q.  -- they do an anatomical of you?
3  A.  Right.  So I wouldn't remember each, you
4  know.
5  Q.  Understood.  But do you have a memory of
6  why you were in segregation in October of '14?
7  A.  Not -- if you showed me a report, I would
8  be able to, but --
9  Q.  Understood.
10  A.  -- not just looking at this.
11  Q.  So in calendar year 2014, how much time do
12  you think you spent in segregation?
13  A.  Maybe 60 days.
14  Q.  Okay.  Are you someone who spends a fair
15  amount of time in segregation, or not?
16  A.  What do you mean, "someone who spends"?
17  Can you clarify?
18  Q.  Sure.  Absolutely.
19      Do you think of yourself as someone who's
20  in segregation a lot?
21  A.  No, I do not.
22  Q.  Okay.  I mean, I assume there's -- I mean,
23  have you had a year where you've not been in segregation?
24  A.  Yes.
25  Q.  Okay.  Have you been in segregation this

Page 102

1  year, 2017?
2  A.  No.
3  Q.  Okay.  Were you in segregation in 2016?
4  A.  I do not believe I was.
5  Q.  Okay.
6  A.  Positive I was not.
7  Q.  Okay.  All right.  So then on -- the next
8  page is October 8, 2014.  This is a visit related to that
9  anatomical with someone named Vickie Nira.  Does this
10  refresh your recollection at all?
11  A.  No.
12  Q.  Okay.  And as of October -- if you see
13  where it says, on the upper left-hand corner,
14  "ibuprofen"?
15  A.  Yes.
16  Q.  You're still taking that in October of
17  '14; is that -- that's the Motrin that Mr. Chamjock
18  prescribed to you?
19  A.  Okay.
20  Q.  Do you understand that?  I mean, ibuprofen
21  and Motrin are the same thing, just different --
22  different names for the same medication.
23  A.  Okay.
24  Q.  Okay.  But do you agree that you were
25  still taking Motrin in October of 2014?

Page 103

1  A.  Yes.
2  Q.  Okay.  All right.  The next page is a
3  handwritten Ambulatory Health Record that appears to me
4  to be dated 10/22/14.  Do you remember anything about
5  seeing someone in medical for your knee in October,
6  October 22 of 2014?
7  A.  No.
8  Q.  Okay.  All right.  The next page is
9  December -- or May 5 -- May 1, 2015.  This is another
10  anatomical.  Do you remember this at all?
11  A.  Vaguely, yes.
12  Q.  Okay.  Do you know why you would have been
13  in segregation in May of '15?
14  A.  Yes.
15  Q.  What was that for?
16  A.  Refusing cell assignment.
17  Q.  Okay.  The next page is the -- is related
18  to -- the Ambulatory Health Record related to May 1,
19  2015.
20      The page after that looks like a removal
21  from population, the same date as -- May 1, 2015.  So if
22  you're removed from population, they do an anatomical,
23  and if you're going to go to segregation, they do another
24  one?  Is that how that works?
25  A.  I do -- I do not know.  I know you -- when

Page 104

1  you go into segregation, they do an anatomical, yes.
2  Q.  Okay.
3  A.  I don't know if they do two.  I don't
4  think so.
5  Q.  So -- fair enough.
6      The last page is what I want to ask you
7  about.  Skip a couple and then the last page.  So the
8  last page is an Ambulatory Health Record in June of 2016.
9  And that's by someone named Tejinder Singh, and that was
10  when you were at Arkansas Valley Correctional Facility?
11  A.  Okay.
12  Q.  Do you remember this at all?
13  A.  No.
14  Q.  Okay.
15  A.  But I'm sure . . .
16  Q.  Okay.  So sort of generally speaking, when
17  was the last time you saw a medical provider for your
18  right knee?  Is that the visit with Chamjock, the last
19  time that you saw someone?
20  A.  That's the -- yes, the last I recall, yes.
21  Q.  Okay.  So that was September of '14?
22  A.  Yes.
23  Q.  So since September of 2014, have you seen
24  any medical provider for your knee at all?
25  A.  No.

Page 117

1  A. This is correct.
2  Q. Okay. Do you understand, under the DOC
3  process, the only way to get out of the designation of a
4  Security Threat Group affiliated with the Crips is to
5  admit your affiliation, so you have to admit to something
6  that you don't believe is true?
7  A. Okay.
8  Q. Right?
9  A. Yes, correct.
10 Q. And that's what you don't want to do; plus
11 you believe if you do that, you'll get beat out of the
12 gang. Do I have that about right?
13 A. Yeah. That's what -- that's what will
14 occur.
15 Q. Right.
16 A. Even on the activation -- the inactivation
17 list, it says that: Have you been jumped out of a gang?
18 Q. Right.
19 A. So, I mean, that will occur. It's not
20 some --
21 Q. The problem with a place like this is,
22 everybody else gets into everybody else's business and
23 does their best to find out what everybody else is doing
24 and why everybody else is here and all of that sort of
25 stuff. Fair?

Page 118

1  A. Yes.
2  Q. Okay. All right. Okay. If you look at
3  page 11, Claim Two has to do with the water at Sterling
4  Correctional Facility.
5       It's my understanding that Correctional
6  Health Partners didn't have anything to do with the water
7  at Sterling and whether it had uranium or not; is that
8  consistent with your understanding?
9  A. This is correct.
10 Q. Okay. The next -- we talked about that.
11 Go to page 15. Page 15 is Claim Four, which has to do
12 with your being sprayed with OC or mace in October of
13 2013.
14      Am I correct in understanding that
15 Correctional Health Partners doesn't have anything to do
16 with that claim?
17 A. Yes.
18 Q. Okay. All right. So let me just look at
19 my notes, Mr. Broadus, and I'm either done or almost
20 done.
21      Have you had to pay any of your medical
22 bills related to your right knee during your
23 incarceration here at Sterling?
24 A. What do you mean, "medical bills"?
25 Q. So the medical care that you received

Page 119

1  related to your right knee, have you had to pay
2  anything --
3  A. Outside of fees, no. We have to pay when
4  we submit a kite. No.
5  Q. Okay. Have you been charged anything
6  related to your right knee treatment that you know of?
7  A. No.
8  Q. Okay. Because they didn't let you declare
9  a medical emergency?
10 A. Right. But you still get charged for the
11 kites.
12 Q. Oh, okay. So if you submit a kite, you
13 get charged for it?
14 A. Yes.
15 Q. How much is a kite?
16 A. I think it's $3.
17 Q. Okay. All right. Even if it's that you
18 really need medical attention --
19 A. Yeah.
20 Q. -- you still get charged?
21 A. Yeah. It doesn't matter.
22 Q. Okay. Have you had any emotional distress
23 related to your knee?
24 A. Can -- can I answer that at a later date
25 because I think that's a --

Page 120

1  Q. Okay.
2  A. -- because --
3  Q. Explain why you need to answer it -- you
4  want to talk to your lawyers about it?
5  A. Yeah, I would like to.
6  Q. Okay. Fair enough. So --
7  A. Because that deals with the relief part,
8  right?
9  Q. Understand -- it does. So let me -- let
10 me ask it a different way.
11      You have had various visits with mental
12 health?
13 A. Yes.
14 Q. Mental health checks in on you on a
15 semi-regular basis; is that right?
16 A. No.
17 Q. No? How frequently do you get a visit
18 from a mental health provider?
19 A. Maybe once every three months.
20 Q. Okay. Have you ever spoken to a medical
21 health -- mental health provider about your knee injury?
22 A. No.
23 Q. Okay. Did anyone tell you that the denial
24 by Correctional Health Partners of the MRI could be
25 appealed?