**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 15-cv-0182-WJM-KLM

JOHN MICHAEL BROADUS

      Plaintiff,

v.

CHAPDELAINE, Associate Warden,[1]
CHP, Clinical Health Provider,
GILES, Lieutenant,
EVA LITTLE, Lieutenant,
LUYANDO, Lieutenant,
THODE, Sergeant,

      Defendants.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

Plaintiff John Michael Broadus ("Broadus") is a prisoner in the custody of the

Colorado Department of Corrections ("CDOC") and is currently housed at CDOC's

Sterling Correctional Facility ("Sterling").  Broadus's Complaint (ECF No. 6) alleges

numerous disparate violations of his constitutional rights by various Sterling employees

and officials.

Currently before the Court are two summary judgment motions, one filed by

Defendant Correctional Health Partners, Inc. ("CHP") (ECF No. 114) and the other filed

by the remaining Defendants, who referred to themselves as the "CDOC Defendants"

---

[1] Plaintiff named this defendant as "Chapdelain" (without an *e* on the end), but the Court is aware from other cases on its docket of the proper spelling, and will use it here.  The Court also understands from other cases on its docket that Defendant Chapdelaine retired in 2016, but that development is immaterial to the theory of liability Plaintiff asserts against him.

(ECF No. 118).  For the reasons explained below, the Court grants summary judgment in favor of all Defendants except Thode and Giles.  Thus, this case remains set for trial as against Thode and Giles, but given the reduced scope of that trial, it will be shortened to four days.

## I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).[2]

---

[2] In the various fact sections below, the recited facts are undisputed unless attributed to a party or otherwise noted.

## II.  CLAIM 1 (KNEE INJURY)

**A.**    **Relevant Facts**

1.    Injury & Response

Broadus injured his knee while playing basketball on February 28, 2014.  (ECF

No. 127 at 12, ¶ 9.)  His knee swelled to "at least twice its normal size," and walking

became very difficult.  (*Id.* ¶ 10.)  The following day, his condition had not improved, so

he showed his knee to a correctional officer (not a party here) who advised that he

should "talk to someone and declare a medical emergency."  (*Id.* at 13, ¶ 11.)  Broadus

claims that he then spoke to Defendant Luyando (also a correctional officer), who

allegedly "told him that the medical clinic probably would not see him, but that he should

submit a medical kite."  (*Id.*)  Luyando "denies that he had knowledge of the alleged

injury" on this date (ECF No. 154 at 3, ¶ 11), but he does not deny that he interacted

with Broadus on this date.

Broadus and Luyando had no further relevant interactions until March 5, 2014.

Their stories of what happened on that date conflict.  Broadus's story is as follows.

By March 5, 2014, his knee had not improved, and he told another correctional

officer (not a party here) that he wanted to declare a medical emergency.  (ECF No. 127

at 13, ¶ 12.)  He was then called into Luyando's office and he asked to declare a

medical emergency, but Luyando "refused to alert medical personnel and told

Mr. Broadus that he could not declare a medical emergency unless he was actually

dying or the injury was life-threatening."  (*Id.* ¶¶ 13–14.)  Broadus then returned to his

cell, and was informed via intercom several minutes later that he was being assigned to

a top bunk in a new cell.  (*Id.* at 14, ¶ 17.)  He protested because he could not climb

onto a top bunk, and he was ordered to speak with Luyando again.  (*Id.*)  During this

second conversation, Luyando refused to change the bunk assignment.  (*Id.* at 19.)

Luyando denies that he spoke with Broadus on March 5 prior to the dispute over

the bunk assignment.  (ECF No. 154 at 3–4, ¶¶ 13–15, 17.)  Luyando agrees that cell

and bunk reassignments were announced that day; moreover, it is undisputed that

Broadus descended the stairs from the third tier of his cellblock to speak with Luyando

about the reassignment.  (ECF No. 118 at 7, ¶¶ 23–24.)  But Luyando denies

knowledge of Broadus's knee injury before that time, and he also says that he observed

Broadus walking with no limp or other obvious problem when coming down the stairs

and entering Luyando's office.  (*Id.* ¶ 24.)

While in Luyando's office, Broadus asked to declare a medical emergency.  (*Id.*

¶ 25.)  According to Luyando, he then contacted the medical clinic, "who denied the

medical emergency and informed Lt. Luyando that Broadus would be seen when

scheduled based on his medical kite requesting an appointment."  (*Id.*)  Broadus denies

that Luyando contacted the medical clinic.  (ECF No. 127 at 6, ¶ 25.)

Regardless of how the conversation with Luyando played out, Broadus ultimately

would not accept a top bunk and so "refused the order [to transfer cells] and was placed

into segregation."  (*Id.* at 14, ¶ 20.)  This development triggered a requirement that

Broadus

> be escorted to the medical clinic for an anatomical
> evaluation.  The "anatomical" is a security-requested
> evaluation in order to determine if an offender has any
> immediate medical or mental health concerns that would

> prevent an offender from being placed in RFP ("removed
> from population") status.  If an urgent medical or mental
> health situation is suspected based on this evaluation, the
> nurse will proceed to initiate a nursing protocol evaluation.  If
> no urgent concerns are identified, no further action is
> expected from the nurse performing the anatomical.  If non-
> urgent issues are identified, the nurse will instruct the
> offender to submit a kite for formal evaluation.

(ECF No. 118 at 7, ¶ 26 (citation omitted).)  The nurse who performed Broadus's

anatomical evaluation noted "swelling" of his right knee (*id.* at 8, ¶ 27), but also wrote,

"No medical attention needed @ this time" (ECF No. 120-1 at 12).

Broadus was seen at the medical clinic for his knee injury on March 25, 2014.

(ECF No. 118 at 7, ¶ 28.)  The clinician who examined him was Keri McKay, PA (not a

party to this lawsuit).  (ECF No. 120-1 at 14.)  According to the "subjective" portion of

McKay's treatment note, Broadus complained of a "dull constant ache" in his right knee

and reported that he had been "trying to just take it easy on his knee with little relief.  He

states he has tried exercises and stretches as well to help with the pain but has not had

any relief."  (ECF No. 120-1 at 14.)  On the "objective" portion of the treatment note,

McKay wrote that Broadus "ambulate[d] into clinic, in and out of chair without difficulty,"

but also that he "[a]mbulate[d] with antalgic gait favoring the right leg, right knee tender

to palpation, with swelling."  (*Id.*)  McKay further wrote, "McMurr[a]y's positive in the

right leg and negative in the left leg."  (*Id.*)  This refers to the McMurray test, which is a

particular method of manipulating the leg and knee "to determine injury to meniscal

structures."  *Stedmans Medical Dictionary*, definition no. 906520 (Westlaw, Nov. 2014

update).  Given Broadus's response, McKay stated she would request an MRI.  (ECF

No. 120-1 at 14.)

5

## 2.    Request for MRI

McKay's MRI request went to Defendant CHP, with whom CDOC contracts "to review and provide prior authorization for medical care to be provided to CDOC inmates outside of the internal CDOC medical system."  (ECF No. 114 at 2, ¶ 1.)  CHP does not have the final say, however, on whether an inmate is authorized for a procedure. Through an appeals process, that question may ultimately end up before CDOC's chief medical officer, who makes the final decision.  (*Id.* at 3–4, ¶¶ 3–10.)

McKay's MRI request to CHP was handled by CHP employee Stephen Krebs, M.D. (not a party to this lawsuit).  (*Id.* at 4–5, ¶¶ 13, 21.)  Dr. Krebs received a complete transcript of McKay's treatment note.  (ECF No. 129-3 at 2.)  On April 10, 2014, he denied the MRI request, explaining as follows: "Declined at present.  Exam only partially suggestive, no plain films described or included, and no conservative therapy described."  (*Id.* at 3.)

On June 2, 2014, McKay submitted on Broadus's behalf a new MRI request to CHP.  (ECF No. 116-2.)  It is unclear whether Broadus had visited her a second time. In any event, McKay's request states, in relevant part:

> Consulting for an MRI of his right knee due to needing further evaluation of joint damage.  [Inmate] ambulating with antalgic gait, wearing knee brace, pain medications, and done physical therapy on his own with little relief.  Will send encounter form 3/25/14. . . . Xrays returned and showing no evidence of bone damage.  MRI prior was denied due to not having the xray.  Has xrays and still needing an MRI to evaluate knee pain and underlying damage as McMurr[a]y's test was positive, and he is having difficulty and pain with walking.

(*Id.*)  On June 13, 2014, Krebs denied this request, explaining "no objective impairment

of ADLs [activities of daily living] noted." (*Id.*)

On September 16, 2014, a different physician assistant at the Sterling medical clinic submitted to CHP a request that Broadus receive physical therapy, and Krebs approved that request on October 6, 2014. (ECF No. 114 at 7, ¶ 34.) Broadus has not seen "any medical provider" regarding his knee since September 2014 (*id.* at 8, ¶ 36), although he claims he submitted a medical kite for further knee care sometime in 2015 because his knee was "still messed up" (ECF No. 126 at 7, ¶ 36 (internal quotation marks omitted)). It is not clear whether "any medical provider" includes physical therapists; or in other words, the record does not disclose whether Broadus attended physical therapy.

**B.    Basic Principles of Eighth Amendment Liability Based on Inadequate Medical Care**

The Eighth Amendment protects against the infliction of "cruel and unusual punishment." U.S. Const. amend. VIII. The Eighth Amendment's prohibition against cruel and unusual punishment encompasses deliberate indifference by prison officials to objectively serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). Objectively serious medical needs are those that have "been diagnosed by a physician as mandating treatment or [are] so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Al-Turki v. Robinson*, 762 F.3d 1188, 1192–93 (10th Cir. 2014) (internal quotation marks omitted). A prison official is deliberately indifferent to such a need when the official "knows of and disregards [the medical need]; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

**C.     "Gatekeeper" Liability**

Broadus's Eighth Amendment claims against Luyando and CHP rely on what is commonly known as the "gatekeeper" theory of liability.  Under this theory, "prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment."  *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000).  But, for a gatekeeper to be liable, the objective component of the Eighth Amendment test requires "substantial harm," meaning that the delay led to "lifelong handicap, permanent loss, or considerable pain."  *Al-Turki*, 762 F.3d at 1193 (internal quotation marks omitted).

**D.     Defendant Luyando**

Broadus's gatekeeper claim against Luyando quickly runs into a causation problem.  *See Scott v. Hern*, 216 F.3d 897, 911 (10th Cir. 2000) ("A plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983.").  Broadus must be able to prove a causal connection between (a) Luyando's alleged refusal to permit him to declare a medical emergency and (b) whatever "lifelong handicap, permanent loss, or considerable pain," *Al-Turki*, 762 F.3d at 1193 (internal quotation marks omitted), that forms the basis of his claim.  In other words, Broadus must have evidence from which a jury could conclude that, had Luyando permitted Broadus to visit the clinic when requested, the subsequent course of events would have been different.

Broadus presents no evidence that this would have taken place, or that any other

course of events would have played out. "Rather, the only evidence in the record of what clinic staff might have done is what they actually did . . . ." *Tantlinger v. Duchaine*, 2016 WL 8201447, at *5 (D. Colo. Aug. 19, 2016). Broadus *did* see a nurse on the day he tried to declare a medical emergency because he refused Luyando's bunk reassignment and was sent to segregation—and, as it happened, was therefore required to undergo an "anatomical" examination at the medical clinic. That nurse noted Broadus's knee injury but concluded, "No medical attention needed @ this time." (ECF No. 120-1 at 12.)[3] Then, when Broadus eventually received more-formal medical care, factors outside Luyando's control delayed the care that Broadus believes he should have received, namely, the MRI and whatever treatment recommendations might have flowed from it. To this day, in fact, it appears that Broadus's knee has never been treated in the manner he believes necessary. "Accordingly, even assuming that [Luyando] behaved precisely as [Broadus] believes he should have, there is no evidence from which a jury could conclude that [Broadus] would have avoided any of the [pain] he actually suffered." *Tantlinger*, 2016 WL 8201447, at *6.

Accordingly, the causation element fails as to Luyando and he is entitled to summary judgment.[4]

_____

[3] To the extent this notation is hearsay, it is not needed for the truth of the matter asserted, but only the fact of assertion. In other words, the nurse chose not to treat Broadus.

[4] Broadus argues that this Court endorsed a separate theory of Eighth Amendment liability based on the bunk assignment, *i.e.*, that Luyando "was deliberately indifferent to Mr. Broadus's injury by exacerbating the injury by assigning Mr. Broadus to a top bunk." (ECF No. 127 at 26 (citing ECF No. 40 at 28–29).) This is doubly incorrect. First, Broadus refused the bunk assignment, so Luyando did not cause any exacerbation. Second, in a Report & Recommendation which the Court later adopted, the Magistrate Judge explicitly stated her understanding that the allegations about assigning Broadus to a top bunk were not meant as a

## E.     Defendant CHP

Broadus asserts that CHP is also liable to him under the Eighth Amendment for preventing his access to medical care.  (ECF No. 126 at 14.)  Broadus states that his claim against CHP is limited to Krebs's June 2014 decision to deny an MRI.  (*Id.* at 12, 16 n.1.)[5]

Beyond the usual gatekeeper elements (*see* Part II.C, above), Broadus's case against CHP involves another layer of complexity because CHP is a business entity, not a natural person.  In the Tenth Circuit, a business entity working on the state's behalf can only be liable through the municipal liability framework established by the Supreme Court in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003); *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 945–46 (10th Cir. 2005).  Under *Monell*, a municipality—or, in this case, a private entity under contract with the state to fulfill one of the state's functions—can be liable in 42 U.S.C. § 1983 for damages only when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

---

separate cause of action, but "solely . . . in support of [Broadus's] claim that Defendant Luyando was deliberately indifferent to his medical need," or in other words, that Luyando acted with the required state of mind when inhibiting Broadus's access to medical care.  (ECF No. 40 at 28 n.9.)  Based on this, the Magistrate Judge found that Broadus's allegations, if true, showed that Luyando "was both aware of facts from which the inference could be drawn that a substantial risk of harm existed, and he also allegedly drew that inference."  (*Id.* at 29.)  To the extent Broadus seeks implicitly to amend his complaint at this late stage with a new theory of liability based specifically on the bunk assignment, the Court denies that request.  *See Fuqua v. Lindsey Mgmt. Co.*, 321 F. App'x 732, 735 (10th Cir. 2009).

[5] There is a lurking question of causation and damages because Broadus has never explained how his knee condition would likely have changed if CHP had approved the MRI, *e.g.*, what care he would have then been prescribed that was different from what he was actually prescribed, etc.  Indeed, to this day, Broadus still has not received an MRI.  But given the outcome below, the Court need not address this problem further.

represent official policy, inflicts the [constitutional] injury." 436 U.S. at 694. As applied

to this case, then, Broadus must be able to show some CHP policy or custom of acting

as a gatekeeper in the face of substantial harm.

Broadus says that the policy at issue here is "requiring the presentation of

several factors to support that an MRI is medically necessary. This policy, requiring

multiple factors before granting an MRI, runs directly counter to the medical standard for

MRIs." (ECF No. 126 at 18 (citation omitted).) Broadus here relies on the testimony of

his expert that the standard of care in the medical community is to order an MRI for a

patient with a positive McMurray test—or in other words, that nothing but a positive

McMurray test is needed to justify an MRI. (ECF No. 126 at 9, ¶ 9.)

Even assuming that CHP abides by the policy Broadus alleges, and further

assuming that Broadus's expert has accurately described the standard of care in the

medical community, Broadus has not pointed this Court to any case in which an entity

was held liable under *Monell* because it required more than the accepted standard of

care before approving a medical procedure. A trial on this matter would essentially be

asking a jury to listen to the testimony of Dr. Krebs and the testimony of Broadus's

medical expert, and then to judge whether CHP impermissibly deviated from the

medical standard of care. If mere medical malpractice cannot rise to an Eighth

Amendment violation, *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a

constitutional violation merely because the victim is a prisoner."), the Court cannot see

how it can nonetheless become a constitutional claim because the malpractice allegedly

flowed from an official policy. Moreover, if a disagreement between medical

professionals about the appropriate treatment of a prisoner cannot be the basis of Eighth Amendment liability, *see McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) ("defendants did not have to bear the risk arising from the variations in the views of the doctors"), the Court cannot similarly see how a simple disagreement between an entity's procedure-approval policies and the community standard of care can be the basis of Eighth Amendment liability.[6]  CHP is entitled to summary judgment in its favor.

## III.  CLAIM 2 (URANIUM IN THE WATER SUPPLY)

Broadus claims that Chapdelaine is liable to him for exposing him to uranium-contaminated water at Sterling for several months.

**A.    Relevant Facts**

1.    <u>Uranium at Sterling</u>

Uranium-238, the form predominantly in our environment, is far more stable than Uranium-235, the form used in atomic weapons.  (ECF No. 118 at 8, ¶ 29.)  In comparison to other states, Colorado has a higher concentration of uranium in the soil and, consequently, it is ubiquitous in this state's environment; it is present in the air, food, water, and Coloradans ingest it every day.  (*Id.* ¶ 30.)  The Environmental Protection Agency (EPA) set the maximum contaminant level (MCL) for uranium at 30 micrograms per liter; however, evidence of chronic chemical toxicity from uranium arises from much higher exposures.  (*Id.* ¶ 31.)  The EPA set the MCL by taking the lowest contaminant level associated with no toxicity in a particular study (600

---

[6] Notably, Broadus has not alleged that CHP made an entirely non-medical decision to deny an MRI.  *Cf. Swan v. Physician Health Partners, Inc.*, 212 F. Supp. 3d 1000, 1009 (D. Colo. 2016).

micrograms per liter) and reducing it by a factor of ten (*i.e.*, to 60 micrograms) as a margin of safety. (*Id.* ¶ 32.) The study then assumed people drink two liters of water per day, yielding an MCL of 30 micrograms per liter. (*Id.*) A safe total daily intake of 60 micrograms per day has been established by the EPA and the World Health Organization. (*Id.*)

Uranium levels in the water supply for the City of Sterling ("City") were, on average, somewhat higher than the MCL from February 2008 through November 2013. (*Id.* at 9–10, ¶¶ 34–35, 40–41.) Sterling obtains its drinking water from the City. (ECF No. 127 at 15, ¶ 31.) The precise uranium levels at Sterling do not necessarily track those measured within the City "due to water being drawn from different wells and different environmental factors influencing the levels." (ECF No. 118 at 11, ¶ 47.) Nonetheless, Sterling performed quarterly testing of its own water for uranium during the time that the City's levels were elevated (2008 to 2013), save for one quarter in 2012 and one in 2013. (*Id.* at 9–10, ¶¶ 36–39; ECF No. 127 at 16, ¶¶ 33, 35.) From 2008 through the first quarter of 2010, Sterling tested below the MCL for uranium. (ECF No. 118 at 9, ¶ 36.) From that point through July 2013, readings fluctuated both above and below the MCL, as high as 33.28 micrograms per liter. (*Id.* at 10, ¶¶ 37–39.) Chapdelaine, Sterling's warden or associate warden at that time, was aware of these readings. (*Id.* at 11, ¶ 46.)

By July 2013, Chapdelaine concluded that the elevated uranium levels "would not decrease" until the City brought an under-construction water treatment plant online. (*Id.*) He therefore instituted an alternate drinking water program, announced to inmates

in a letter distributed on August 22, 2013.  (*Id.* at 10, ¶ 42.)  That letter described the

City's problems with uranium, which were "expected to be resolved soon with the

planned opening of a new state-of-the-art water treatment facility in the next few

months.  (ECF No. 118-21 at 1.)  It also stated that Sterling's water showed a

> small increase in the allowable amount of uranium . . . .  The Colorado Department of Public Health and Environment (CDPHE) believes that uranium is not considered to be a contaminant associated with health effects from short-term exposure at the recently observed levels.  However, some people who drink water containing uranium in excess of the drinking water standard over many years may have an increased risk of getting cancer and kidney toxicity.

(*Id.*)  The letter went on to announce the following "proactive . . . precautionary

measure[s]":

> - Beginning this week, the CDOC will supply an additional source of drinking water brought to our facility from Cañon City each day.
>
> - Optional drinking water stations will be set up and maintained at locations where you now find drinking water. . . .
>
> - This alternative source of drinking water is optional and you may choose to continue drinking tap water.
>
> - The CDPHE believes that showering, washing, and eating meals prepared with tap water is not likely to significantly increase your risk of cancer or kidney toxicity.  You may continue to shower and wash using tap water.
>
> - If you have reduced kidney function, you may be at increased risk of cancer or kidney toxicity and should seek advice from the facility medical staff.

(*Id.* at 1–2.)  Sterling shipped in Cañon City water through March 2014, at which point

the facility felt assured that the City's new water treatment plant (operational since

November 2013) had actually solved the uranium problem.  (ECF No. 118 at 11, ¶ 44.)

### 2. Alleged Effect on Broadus

Broadus arrived at Sterling in April 2013.  (*Id.* at 14, ¶ 59.)  Upon receiving the August 22, 2013 letter regarding uranium, Broadus stopped drinking tap water and stopped eating food prepared with substantial amounts of water.  (ECF No. 127 at 17, ¶ 42.)  This confined him to the water shipped in from Cañon City, which was only available in public areas.  (*Id.* ¶ 43.)  Given his out-of-cell schedule, this meant he could access the alternative water source for two hours in the morning, two hours in the afternoon, two hours in the evening, and during each of the three regular meals (20 minutes each).  (*Id.*)  The alternative source was typically depleted during these time frames given the approximately 100 other inmates allowed out of their cells at the same time.  (*Id.*)  If inmates in Broadus's unit were on lockdown (*e.g.*, for security reasons), Broadus says he was not given access to the alternative water source.  (*Id.* ¶ 45.)  When he asked correctional officers for the alternative source, he was told to drink from the faucet in his cell.  (*Id.* at 18, ¶ 46.)

On December 31, 2013, Broadus saw a nurse at the medical clinic based on a complaint of blood in his stools two days in a row.  (ECF No. 118 at 12, ¶¶ 52–53.)  He had no symptoms of dehydration at that time, and testing for blood in the stool was negative.  (*Id.* ¶ 53.)

On January 22, 2014, Broadus had a follow-up visit about blood in his stool but stated that he had not had any since.  (*Id.* at 13, ¶ 54.)  He again had no symptoms of dehydration.  (*Id.*)

On March 25, 2014, Broadus saw PA McKay, again complaining of blood in his stool (*id*. ¶ 56)—this is the same visit described in Part II.A.1, above, during which he also complained of knee pain. McKay ordered a colonoscopy, which took place on April 17, 2014, and was entirely normal. (*Id*.)

Broadus was informed about this time that the alternate water program was ending and he should return to drinking tap water. (ECF No. 127-1 ¶ 46.) Overall, "[t]he symptoms Broadus complained of, including dehydration, tender gums, dizziness, painful urination, and blood in his stool, are not consistent with uranium toxicity." (ECF No. 118 at 13, ¶ 58.) Broadus claims, however, that medical tests conducted before he arrived at Sterling and two years after the water problem ceased showed elevated levels of certain proteins that suggested reduced kidney function. (ECF No. 127 at 18, ¶¶ 48–49.) The significance of his pre-Sterling test is unclear, except perhaps to imply that he may have been among those with reduced kidney function that were more susceptible to the effects of uranium. As for the post-contamination test, Broadus argues that it is evidence he may have been affected by the uranium. (ECF No. 127 at 30–31.) It is undisputed, however, that the problems created by uranium ingestion (which can include kidney problems) resolve quickly after uranium exposure ends. (ECF No. 118 at 12, ¶ 51.)

## B.    Official Liability for Unconstitutional Conditions of Confinement

A prison official's deliberate indifference to an inmate's health or safety may violate the Eighth Amendment's ban on cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Such claims have an objective component and a

subjective component. The objective component requires a "substantial risk of serious harm" to the inmate. *Id.* (internal quotation marks omitted). The subjective component requires that the prison official acted with "deliberate indifference" to the inmate's health or safety, meaning that the official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," and that the official actually "dr[e]w the inference." *Id.* at 837.

## C.    Defendant Chapdelaine

The Tenth Circuit's reasoning in *Cary v. Hickenlooper*, 673 F. App'x 870 (10th Cir. 2016) forecloses Broadus's claim on the objective element. Quoting from the same August 22, 2013 memo reproduced above (Part III.A.1), the Tenth Circuit concluded that the uranium in the water at Sterling did not present a substantial risk of serious harm given that inmates' exposure to elevated levels of uranium had not been and would not be long-term. *Id.* at 874–75. Broadus's dehydration does not change this outcome. His efforts to avoid drinking tap water are of no constitutional significance because the tap water did not pose an objectively serious risk of harm.

For these reasons, Chapdelaine is entitled to summary judgment on the objective component of the deliberate indifference test.

## IV.  CLAIM 3 (STG STATUS)

Broadus's Claim 3 centers around CDOC's determination that Broadus was a member of the Crips gang, which CDOC has designated a "security threat group" or "STG." Broadus claims that Little has unconstitutionally denied him an opportunity to have this STG label removed from his prison record without going through CDOC's

formal gang disaffiliation process.

## A. Relevant Facts

Broadus has known since the year 2000, when he became a CDOC inmate, that CDOC had identified him as a member of the Crips STG. (ECF No. 118 at 14, ¶ 60.) Broadus claims that he is not, and never has been, a member of the Crips or any other STG. (ECF No. 127 at 18, ¶ 50.) Because of his classification as a Crip, however, approximately 95% of his cellmates have been Crips, and he has received threats from members of rival gangs. (*Id.* at 19, ¶¶ 52, 54.)

Defendant Little is an intelligence officer at Sterling, and responsible for investigating STG activity. (*Id.* ¶ 53.) When Broadus arrived at Sterling, Little did not independently investigate whether his STG designation was appropriate. (*Id.*)

Little "was involved in creating the process inmates must go through to remove their STG status," which is currently embodied in CDOC's Administrative Regulation ("AR") 1150-02RD. (*Id.* ¶ 55.) "Attachment C" appended to that regulation is a "Request for STG Removal" form. (ECF No. 120-2 at 16.) The form's questions assume that CDOC's STG classification is correct, *e.g.*, "How old were you when you joined the STG?", "How did you become involved in the STG?", "What activities were you involved in while you were active or associating with the STG?", etc. (*Id.*) And the intelligence officer who evaluates the inmate's request for STG removal is expected to obtain from the inmate as much inside information is possible about the STG. (ECF No. 127 at 21, ¶ 65.)

The applicable procedures also direct that prison staff "should increase

monitoring of the [inmate seeking removal from STG status] to ensure their safety."
(ECF No. 120-2 at 19.)  This is because such an inmate faces an increased risk of
violence due to the likelihood of other STG members perceiving disaffiliation as
disrespect and therefore retaliating.  (ECF No. 127 at 20, ¶ 60.)  Broadus claims that the
Crips are especially notorious for "jumping out" gang members, *i.e.*, beating those who
attempt to disaffiliate.  (*Id.* ¶ 62.)  The STG removal process is supposed to be
confidential (ECF No. 118 at 15, ¶ 66), but, according to Broadus, "it is not so in
practice: there is widespread awareness among inmates when an individual undergoes
the deactivation process" (ECF No. 127 at 20–21, ¶ 63).

Shortly after his arrival at Sterling in April 2013, Broadus met with Little to
complain about his STG classification.  (*Id.* at 21–22, ¶ 67.)  Little told Broadus that he
had two options: following the process established through AR 1150-02RD, or writing a
letter to the "Unified Intelligence Team" at CDOC headquarters.  (*Id.*)[7]  Broadus claims
he "expressed to Defendant Little his concern that he faced a significant risk of physical
harm as a result of his STG label, and that the removal process she was suggesting
[referring to AR 1150-02RD] would likewise place him at significant risk of harm,"
because it would require him "to falsely admit that he had been an associate of the
Crips.  The result of such an admission is that Mr. Broadus's will be targeted by other
gang members and will get beat out of this gang."  (*Id.* ¶¶ 68–69 (internal quotation
marks and citations omitted).)  Increasing this risk, says Broadus, is the AR 1150-02RD
process's focus on obtaining intelligence about gang activities within the prison, such

---

[7] At some point—it is not clear whether before or after the meeting with Little—Broadus
indeed wrote to the Unified Intelligence Team, but received no response.  (*Id.*)

that "inmates undertaking that process face a risk of being perceived as an informant or 'snitch.'" (*Id.* ¶ 65.)  But, says Broadus, Little has refused to assist him in resolving this predicament.  (*Id.* ¶ 71.)

Broadus "has been assaulted while at [Sterling] by a shot-caller for the Crips due to his desire to disassociate from the gang." (*Id.* at 23, ¶ 73.)  Broadus claims this happened in October 2014.  (ECF No. 127-1 ¶ 56.)

Broadus further claims that Little has told another inmate—one who also believes he was erroneously classified as a Crip—that Broadus was a Crip "while on the streets." (ECF No. 127 at 21, ¶ 64; ECF No. 127-1 ¶ 60; ECF No. 26 at 18.)[8]

## B.  Official Liability for a Threat of Inmate-on-Inmate Violence

The Eighth Amendment's prohibition of "cruel and unusual punishments" grants prisoners "a right to be reasonably protected from constant threats of violence . . . from other inmates." *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996) (internal quotation marks omitted).  This is so because "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer*, 511 U.S. at 834.

The standard for official liability in these circumstances is the same as for unconstitutional conditions: there must exist a substantial risk of serious harm (the objective component) and the prison official must actually draw the inference that such a risk exists (the subjective component).  (*See* Part III.B, above.)

_____

[8] Based entirely on this claim, Broadus accuses Little of "perpetuat[ing] false rumors about Mr. Broadus's gang affiliation."  (ECF No. 127 at 21, ¶ 64; *see also id.* at 31.)  This a serious overstatement of what the evidence actually shows.

**C.  Defendant Little**

1.  <u>Response to Further Briefing</u>

Broadus obviously seeks an order having the Crip designation removed from his prison record.  However, when reviewing the parties' summary judgment briefs, the Court recognized that Little is not named as a defendant in her official capacity.  (*See* ECF No. 6 at 1, 3, 13–14.)  Thus, the Court began to question whether an injunction directed at Little in her personal capacity would provide the relief Broadus seeks.  The Court also noted Broadus's allegation that he "has been assaulted while at [Sterling] by a shot-caller for the Crips due to his desire to disassociate from the gang"  (ECF No. 127 at 23, ¶ 73), potentially suggesting that there may be no injunctive relief that could remedy his situation because Crips at Sterling already know he is attempting to disaffiliate.  The Court therefore informed the parties of its "basic concern about Article III jurisdiction as to Defendant Little, particularly the 'redressability' requirement," and ordered Broadus to file a supplemental brief addressing the following:

- What remedy is Plaintiff seeking against Defendant Little in her personal capacity?

- Assuming Plaintiff is seeking at least an injunction—

  o  Does Defendant Little currently hold authority within CDOC to remove an inmate's STG designation?

  o  By what process could Defendant Little remove Plaintiff's STG designation without exposing him to the risks he fears from the AR 1150-02RD process, particularly given that it is already known among Crips at Sterling Correctional Facility that Broadus is attempting to have his STG designation removed?

(ECF No. 156 at 2–3.)

21

Broadus responded by asserting that he sues Little for "monetary damages . . . in her personal capacity, as well as injunctive relief against her in her official capacity," although without explaining what damages he has incurred or where he named Little as an official-capacity defendant.  (ECF No. 157 at 4–5.)  Regardless, Broadus asserted that Little now works in the "Unified Intelligence" unit at CDOC headquarters, and that Little could remove his STG designation with "a few keystrokes in CDOC's computer system."  (*Id.* at 5–6.)  Finally, in a footnote, Broadus

> respectfully requests that, in the event the Court determines that Defendant Little no longer possesses authority to grant this relief by virtue of her new position within CDOC, . . . Plaintiff be permitted to substitute the proper CDOC defendant, in his or her official capacity, to provide the requested relief.

(*Id.* at 6 n.2.)

As to whether any injunction could help him now that Sterling Crips know Broadus is trying to have his Crip designation removed, Broadus first emphasized that "the AR 1150-02RD process is largely an intelligence-gathering exercise," and that "[a]voiding that process would decrease the risk of retaliation against him for being a 'snitch.'"  (*Id.* at 6.)  Broadus next argued that

> the AR 1150-02RD process would require Mr. Broadus to falsely admit to having been a Crip.  Doing so would cause Mr. Broadus to "be targeted by other gang members" and "get beat out of this gang."  This risk, too, would be diminished if his label were simply removed without requiring a false admission of gang affiliation.  Indeed, the Court order itself would serve as proof that Mr. Broadus had been erroneously classified as a Crip; that he did not undergo the AR 1150-02RD process; and that he thus did not provide prison officials with intelligence on the Crips—all of which would reduce his risk of retaliation or other harm from gang

members.

(*Id.* at 7 (quoting Broadus's deposition; citations omitted).)  Finally, Broadus asserted

that his conditions of confinement would improve because he would no longer be

classified as a Crip and therefore no longer subject to housing and transfer restrictions

and guilt by association when Crips misbehave.  (*Id.* at 7–8.)

      2.   <u>Clarifying Broadus's Claim</u>

Broadus's surreply does not dispel the Court's concerns.  To understand why,

the Court first must make explicit a claim Broadus is *not* bringing.  He is not seeking

relief because his allegedly erroneous Crip designation puts him at risk of violence from

Crip *rivals*.  To be sure, he says he "has received threats from other gang members as

a result of his erroneous classification as an associate of the Crips."  (ECF No. 127 at

19, ¶ 52.)  But that is not the basis of his claimed injury.  Indeed, Little's first argument

for summary judgment in her favor is that the two-year statute of limitations for § 1983

claims has long since expired for any claim that CDOC erroneously classified Broadus

as a Crip.  (ECF No. 118 at 20.)  To that argument, Broadus responds that "[h]e is not

challenging his original designation as an associate of the Crips, but rather Defendant

Little's refusal to provide him with a means of removing that label without subjecting him

to a substantial risk of harm."  (ECF No. 127 at 37.)  Accordingly, the question of

whether CDOC—or Little herself—properly believes Broadus to be a Crip is not at

issue.

As for the claim he actually asserts, Broadus argues, in effect, "I am not currently

at risk of Crip violence, but I want to pursue a course of action that will put me at risk of

Crip violence and you, Defendant Little, are violating the Constitution by not finding a way to protect me."  The curious nature of this claim must be kept in mind as the Court analyzes the possibility of damages and injunctive relief, below.

       3.      <u>Liability for Damages—Qualified Immunity</u>

It is not clear what damages Broadus seeks from Little.  Regardless, Broadus must first overcome Little's qualified immunity defense.  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted).  "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time.  *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000).  "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).

Applying these factors, it is not clear that Little has violated any constitutional right.  If Little had ignored a substantial threat of Crip violence which had ripened into injury, then Broadus would likely have a viable claim.  But Broadus does not claim that

Little has ignored any such threat.  He *does* allege that a Crip "shot-caller" has attacked him "due to his desire to disassociate from the gang."  (ECF No. 127 at 23, ¶ 73.)  He does not, however, link this incident to Little in any way.  He does not explain how it became known that he wanted to disassociate from the Crips, or whether Little had any reason to suspect that such an assault might be forthcoming.  Thus, there is a serious question whether any threat of violence has ripened into injury, which is required to hold Little liable for damages.

Moreover, Broadus has not explained how he asserts a clearly established right.  Obviously the right to be protected from inmate-on-inmate violence, when prison officials know of a substantial threat, is clearly established.  *See Farmer*, 511 U.S. at 834.  But the violence Broadus currently fears is violence flowing from Crips' knowledge that he successfully disassociated.  He has not done so yet.  Nor does he have a constitutional right to have his STG classification removed from his prison file.  Thus, the right Broadus asserts is something in the nature of a right to be protected from violence he expects will flow from a procedure he refuses to follow, and to which he has no independent right.  Broadus does not attempt to demonstrate that this is a clearly established right, and so Little is entitled to qualified immunity from damages liability.

4.    Injunctive Relief

Qualified immunity does not foreclose injunctive relief.  *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1233 n.3 (10th Cir. 2004).[9]  Entitlement to injunctive relief for

---

[9] In the Court's experience, civil rights plaintiffs always seek injunctive relief against government officials *in their official capacities.*  The undersigned has never before seen a case such as this where a plaintiff seeks something that looks like an official-capacity injunction but the relevant defendant is sued only in her individual capacity.  The undersigned is therefore

an allegedly ongoing threat of violence in prison is judged according to the defendants' actions and attitudes during the lawsuit, and their likely actions and attitudes after the lawsuit is over. *See Farmer*, 511 U.S. at 845–46. The Court finds, however, that it lacks Article III jurisdiction over the injunctive relief Broadus seeks—an order requiring Little to remove the STG designation from his file—because such an order would not diminish the threat of violence of which he complains. It would, rather, bring that violence upon him. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (federal courts' Article III jurisdiction requires injury in fact, causation, and power to grant relief that will redress that injury); *see also United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994) ("the burden is on the party claiming that the court has subject matter jurisdiction").

To begin, Broadus must understand that at least one important aspect of the relief he requests will not be forthcoming, namely, a "Court order [that] itself would serve as proof that Mr. Broadus had been erroneously classified as a Crip." (ECF No. 157 at 7.) As already noted, whether CDOC erroneously classified him as a Crip is not in question here, so the Court will not issue any sort of findings or declaratory judgment to this effect. To the extent Broadus means to say that an injunction requiring CDOC to strike his STG classification would implicitly convey the falsity of that classification, he

---

unaware whether qualified immunity might have some application, *i.e.*, to an injunction against a defendant in her individual capacity. *Cf. id.* ("Qualified immunity applies to claims for monetary relief against officials in their individual capacities, but it is not a defense against claims for injunctive relief against officials *in their official capacities.*" (emphasis added)). But given the outcome below, that matter need not be resolved here. Moreover, if Broadus's request for injunctive relief had merit, the Court would be inclined to grant his request to substitute an official-capacity defendant. (*See* ECF No. 157 at 6 n.2.)

does not explain how Sterling Crips (or inmates generally) would learn about the order. The Court highly doubts that Broadus intends to publish the order to his fellow inmates. Indeed, although Broadus's surreply emphasized the "snitch" perception that may come through the disaffiliation process, most of his summary judgment response brief focused on the fact that prison gangs simply do not tolerate disaffiliation. (*See* ECF No. 127 at 20–22, ¶¶ 60–63, 66, 68–69; *id.* at 32–33, 35.) Broadus actually discusses disaffiliation and "snitching" as distinct threats:

- "Among the safety concerns [flowing from disaffiliating with a gang] is that the gang from which the inmate is attempting to disassociate will view [it] 'as a disrespect to them.' There is *also* concern about retaliation based on the amount of information about the gang's activity that the inmate is expected to disclose as part of the deactivation process." (*Id.* at 20, ¶ 60 (citation omitted; emphasis added).)

- "It is common knowledge that gangs 'beat out' or 'jump out' members who attempt to leave the gang, *and* they severely punish individuals perceived to have disclosed information about the gang to officials." (*Id.* at 35 (emphasis added).)

Thus, if Broadus publicizes the Court-ordered removal of his STG designation, he invites the beating that he fears, even if some inmates draw the inference that Broadus at least was not required to divulge secret information about the Crips.

On the other hand, if Broadus does not publicize the Court's order, inmates will learn anyway that CDOC no longer treats him as a Crip. Broadus himself asserts that

"STG designation . . . impacts aspects of an inmate's incarceration that [are] visible to other inmates and [that] enable them to determine the inmate's status." (ECF No. 127 at 20–21, ¶ 63.) Broadus refers at least to housing arrangements (*i.e.*, inmates noticing that a Crip is no longer regularly housed with other Crips, or that the inmate is now housed with an inmate known to be a member of Crip rival gang) and lockdowns (*i.e.*, no longer being locked down with other Crips on account of Crip misbehavior). (*See also* ECF No. 118-27 at 6.) But Broadus himself invites these "visible" aspects of his incarceration: he wants to be free of housing restrictions and Crip-related lockdowns. (ECF No. 157 at 7–8.)

Broadus's theory has long been that AR 1150-02RD's primary harm is the alleged need to admit Crip affiliation, and that after such an admission, disaffiliation would bring upon him the wrath of actual Crips. (*See, e.g.*, ECF No. 6 at 13–14; ECF No. 127 at 22, ¶ 69.) In other words, he seems to be saying that if he is excused from *admitting* Crip membership, actual Crips—who already consider him one of their own and have attacked him for expressing a desire to disassociate—will somehow learn that he was excused from admitting Crip membership and then they will simply believe him that he has never been a Crip. Yet Broadus provides no support for such an inference. Rather, his evidence overwhelmingly points to threatened harm flowing from having been classified as a Crip in the first place, *i.e.*, Crips' tendency to "beat out" members (whether or not they are perceived as snitches), and the fact that it is already known among Sterling Crips that Broadus is classified as a Crip and is attempting to have that classification removed. An order from this Court requiring CDOC to remove that

28

classification would put Broadus at risk of the very harm he is trying to avoid.  Indeed, it would place him at greater risk of harm than he faces now.

Because Broadus does not answer Little's argument that the statute of limitations has run on any claim alleging improper classification, and because Broadus has not shown that this Court can grant a remedy that would avoid placing him in greater danger of Crip-perpetrated violence than he now faces, the Court finds that it cannot issue an order that would redress Broadus's injury.  Accordingly, the Court lacks Article III jurisdiction over Broadus's request for injunctive relief against Little.

## V.  CLAIM 4 (PEPPER SPRAY INCIDENT)

Broadus sues two Sterling officers, Thode and Giles, for allegedly refusing to permit him to decontaminate after a pepper spray incident.

## A.    Relevant Facts

On October 23, 2013, corrections officers were supervising inmates' return to their cells, and an inmate began punching at one of the corrections officers.  (ECF No. 118 at 16, ¶ 70.)  A corrections officer named Swingle—formerly a defendant in this case (*see* ECF No. 145)—sprayed that inmate with pepper spray.  (*Id.*)  Apparently on accident, Swingle also sprayed Broadus, who was behaving peacefully but happened to be nearby.  (ECF No. 127 at 23, ¶¶ 77–78.)  Broadus nonetheless returned to his cell. (*Id.* at 24, ¶ 79.)

In his cell, Broadus experienced significant burning and pain from the pepper spray.  (*Id.* ¶ 80.)  Defendants say that Broadus then began kicking his cell door, so correctional officers resolved to place him in segregated housing based on bad

behavior. (ECF No. 118 at 16, ¶ 73.) Broadus denies this and says that his cellmate had been using the intercom system to ask for someone to come help Broadus, and a correctional officer arrived to take Broadus to segregated housing, for no apparent reason. (ECF No. 127 at 9, ¶ 73.)

As noted above (Part III.A.1), admission to segregated housing first requires an "anatomical" exam at the prison medical clinic. Broadus says that he told the nurse he had been sprayed with pepper spray, and she responded that he would have an opportunity to decontaminate once in segregated housing. (*Id.* at 24, ¶ 81.) Then, according to Broadus,

> Defendant Thode took Mr. Broadus from his anatomical evaluation to his cell in segregation. Mr. Broadus spoke with him at that time, as well as later that day when he walked by Mr. Broadus's cell. Both times, Mr. Broadus asked to decontaminate [*i.e.*, to shower]. In response, Defendant Thode told him that he first needed to confirm that Mr. Broadus had been sprayed with [pepper spray]. Mr. Broadus showed him his neck, head, and eyes showing a reaction to the [pepper spray]. Although Defendant Thode told Mr. Broadus that he would talk to someone, Mr. Broadus never heard back.

(*Id.* ¶ 82.) Thode denies this account, asserting that he was not present on that date because he was in an eight-hour training session, as reflected on his training records. (ECF No. 118 at 17, ¶ 76.)

Later that day, Defendant Giles was performing medical rounds, and Broadus asked him for an opportunity to shower. Giles allegedly "asserted that all inmates who had been sprayed with [pepper spray] had already decontaminated. When Mr. Broadus showed him his reaction to [pepper spray], Mr. Giles told him that a shower would not

do Mr. Broadus any good because the effects of [pepper spray] should wear off." (ECF No. 127 at 24, ¶ 83.) Giles says he does not recall this conversation. (ECF No. 118 at 17, ¶ 79.)

Broadus had no water in his cell so he could not decontaminate that way. (ECF No. 127 at 24, ¶ 84.) He did not receive an opportunity to shower until two days later. (*Id.* at 25, ¶ 85.) The pepper spray caused Broadus to

> develop[] welts and his skin peeled off. Also, during the time he was not allowed to decontaminate he felt a painful, constant burn on his skin. Any time he moved or anything touched his skin, the burning would reignite even more as if his skin was on fire. It was hard to breathe, and he was constantly coughing and sneezing.

(*Id.* ¶ 86.)

## B. Defendants Thode & Giles

The Magistrate Judge found that not permitting an inmate to shower for 48 hours after being exposed to pepper spray was "obviously egregious" such that an inmate's right to be free from such treatment can be considered clearly established without a case directly on point. (ECF No. 40 at 27.) No Defendant objected to the Magistrate Judge's recommendation and the Court subsequently adopted it. (*See* ECF No. 51 at 2, 7–8.) Thus, there is no question that *if* Thode and Giles behaved as alleged, they are not entitled to qualified immunity.[10]

There is a genuine dispute of material fact whether Thode and/or Giles behaved

---

[10] Defendants' only argument for qualified immunity as to Claim 4 is that there is that "us[ing] [pepper spray] to quell a facility disturbance" does not violate any clearly established law. (ECF No. 118 at 35.) This refers to former Defendant Swingle; it has no application to Thode or Giles.

as alleged, including whether Thode was in training at the time he allegedly interacted with Broadus. Accordingly, Thode and Giles are not entitled to summary judgment.

## VI. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendant CHP's Motion for Summary Judgment (ECF No. 114) is GRANTED;

2.  The CDOC Defendants' Motion for Summary Judgment (ECF No. 118) is GRANTED as to Defendants Chapdelaine, Little, and Luyando, but DENIED as to Defendants Giles and Thode;

3.  At the conclusion of this case, final judgment will enter in favor of Defendants CHP, Chapdelaine, Little, and Luyando; and

4.  As against defendants Giles and Thode, this matter REMAINS SET for a Final Trial Preparation Conference on March 30, 2018, and a jury trial beginning on April 16, 2018, but that trial is now shortened to **four** days. At the Final Trial Preparation Conference, the parties shall be prepared to discuss whether a trial against Giles and Thode could be completed in an even shorter time.

Dated this 15th day of February, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge